**HAY & FORAGE INDUSTRIES, et al., Plaintiffs,**

v.

**NEW HOLLAND NORTH AMERICA, INC., Defendant.**

**No. 97–2150–JWL.**

United States District Court, D. Kansas.

Nov. 17, 1998.

Thomas H. Van Hoozer, Warren N. Williams, John M. Collins, Stephen D. Timmons, Andrew G. Colombo, Hovey, Williams, Timmons & Collins, Kansas City, MO, for plaintiffs.

Jack T Bangert, Sherman, Taff & Bangert, P.C., Leawood, KS, Devon A. Rolf, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Mark D. Katz, Sherman, Taff & Bangert, P.C., Kansas City, MO, Thomas J Macpeak, Robert V Sloan, Mark Boland, Steven M Gruskin, Sughrue, Mion, Zinn, Macpeak & Seas, PLLC, Washington, DC, for New Holland North America, Inc., defendant.

Devon A. Rolf, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Thomas J Macpeak, Robert V Sloan, Mark Boland, Steven M Gruskin, Frank L Bernstein, Sughrue, Mion, Zinn, Macpeak & Seas, PLLC, Washington, DC, for New Holland North America, Inc., counter-claimant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This patent case was tried to the court in Kansas City, Kansas over twelve days from September 29, 1998 to October 15, 1998. Plaintiffs Hay & Forage Industries, Case Corporation, HFI Holdings, Inc., AGCO Corporation, and Hesston Ventures Corporation sued defendant New Holland North America, Inc. for infringement of United States Patent No. 5,272,859 (" '859 patent"), which is owned by plaintiff Hay & Forage Industries. Plaintiffs allege that certain hay harvesting machines sold in the United States by the defendant infringe the '859 patent. The court held a *Markman* hearing on the matter on June 1, 1998, and subsequently issued an order construing certain disputed claims of the '859 patent. *Hay & Forage Indus. v. New Holland North America, Inc.*, 25 F.Supp.2d 1170 (D.Kan.1998), (*"Hay & Forage I"*). Later, the court concluded on summary judgment that the defendant's accused machine literally infringes claims 1, 2, 8, and 9 of the '859 patent.[1] The parties tried to the court the issues of infringement of claims 10 and 11 under the doctrine of equivalents and invalidity of the patent for anticipation, derivation, omission of a coinventor, and obviousness.

The court ultimately concludes that judgment must be for the defendant. First, the court concludes that the defendant's machine does not infringe claims 10 and 11 under the doctrine of equivalents. Next, the court concludes that the '859 patent is not invalid pursuant to defendant's anticipation, derivation, or omission of a coinventor theories. Finally, the court concludes that claims 1, 2, 8, and 9 of the patent are invalid because they would have been obvious to a person of ordinary skill in the art. Claims 10 and 11 are not invalid for obviousness.

The following findings of fact and conclusions of law are made pursuant to Fed. R.Civ.P. 52(a).[2]

## TABLE OF CONTENTS

I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1104

1. The parties sought summary disposition of most of the issues in this case, but the court denied seven of the parties' eight motions for partial summary judgment. *See Hay & Forage Indus. v. New Holland North America, Inc.*, 25 F.Supp.2d 1180 (D.Kan.1998) (*"Hay & Forage II"*) (denying four motions for partial summary judgment); *Hay & Forage Indus. v. New Holland North America, Inc.*, 25 F.Supp.2d 1195 (D.Kan.1998) (*"Hay & Forage III"*) (granting plaintiffs' motion for partial summary judgment of infringement of claims 1, 2, 8, and 9 but denying three other motions for summary judgment).

2. Many of the court's findings and conclusions herein are not necessary to the ultimate disposition of this case. However, the court feels it is important to set out fully its factual findings and legal conclusions on all issues presented.

 A. The Parties ............................................1104
 1. Plaintiffs ..........................................1104
 2. Defendant..........................................1104
 B. General Characteristics of Mower Conditioners ...............1104
 C. The '859 Patent ......................................1105
 D. The Accused Machine ..................................1107
 E. Development Work by Marc Berlivet in Coex, France ..........1108
 1. PT–8D..............................................1108
 2. X56–1 .............................................1109
 3. X56–2 .............................................1109
 4. X56–3 .............................................1109
 5. Alleged Mockups in Winter 1976–77 ..................1109
 6. X56–4 .............................................1109
 7. X56–5 .............................................1110
 F. Prior Art ...........................................1110
 1. Niemeyer 1570......................................1110
 2. '418 Patent ........................................1110
 3. Australian Patent ..................................1111
 4. New Holland 601–611 Forage Harvesters .............1111
 5. Dickensheid Patent.................................1112
 6. Eberly Patents .....................................1112
 7. Dutch Patent ......................................1112
 8. Deere Patents .....................................1112
 9. Kuhn Patent.......................................1113
 10. Other Patents .....................................1113
 G. Defendant's Design Efforts .............................1113
 1. Creation of the 1431 ...............................1113
 2. Ken McLean ......................................1114

 II. Infringement of Claims 10 and 11 ..........................1114
 A. Legal Framework ....................................1114
 B. Analysis ............................................1115
 1. Inclusion of Bracket and Slide Plates in 1431 Steering Structure .......1115
 2. Claim 10 and the All Elements Rule .................1116
 a. Pivotal Connection with the Tongue at a Point....................1116
 b. Approximately Equidistant .....................1116
 c. Telescoping Linkage .........................1118
 3. Claim 11 ..........................................1118

 IV. Invalidity Generally .....................................1119

 V. Invalidity Pursuant to 35 U.S.C. § 102(b) ...................1119
 A. Legal Framework ....................................1119
 B. Analysis: Claim 1....................................1120
 1. Horizontally Spaced Pivot Axes .....................1120
 2. Steering Structure .................................1121
 3. Header Supported by the Frame .....................1123
 D. Analysis: Claims 2, 8, and 9 ...........................1124

 VI. Invalidity Pursuant to 35 U.S.C. § 102(f); Related Theories ...............1125
 A. Legal Framework ....................................1125
 1. Derivation.........................................1125
 2. Coinventorship ....................................1126
 B. Analysis ............................................1126
 1. Prior Complete Conception .........................1126
 a. Lack of Contemporaneous Documents or Photographs............1127
 b. Unclear Memories .........................1128
 c. Rule of Reason ...........................1128
 2. Contribution to Conception .........................1130

 VII. Invalidity Pursuant to 35 U.S.C. § 103 ......................1131

A. Legal Framework ...................................................1131
B. Claims 10 and 11 Not Invalid for Obviousness .........................1132
 1. Scope and Content of Prior Art ...................................1132
 2. Level of Ordinary Skill in the Art ...............................1133
 3. Differences Between the Claimed Invention and the Prior Art .........1133
 4. Objective Considerations ........................................1135
 a. Praise in the Industry .......................................1135
 b. Commercial Success ........................................1135
 c. Long-felt Need .............................................1136
 d. Synergy ....................................................1136
 e. Independent Development ....................................1136
 5. Summary ........................................................1137
C. Claims 1, 2, 8, and 9 Invalid for Obviousness ..........................1137
 1. Scope and Content of Prior Art ...................................1137
 2. Level of Ordinary Skill in the Art ...............................1137
 3. Differences Between the Claimed Invention and the Prior Art .........1137
 4. Objective Considerations ........................................1142
 a. Independent Development ....................................1142
 b. Copying; Praise in the Industry .............................1142
 c. Commercial Success ........................................1143
 d. Long-felt Need .............................................1143
 5. Summary ........................................................1144

VIII. Conclusion .......................................................1144

## I. Background

### A. The Parties

#### 1. Plaintiffs

The parties plaintiff in this lawsuit are generically controlled by two entities: plaintiff Case Corporation ("Case") and plaintiff AGCO Corporation ("AGCO"). Case is a Delaware Corporation and has its principal place of business in Racine, Wisconsin. AGCO is a Delaware corporation and has its principal place of business in Duluth, Georgia. Plaintiff Hay & Forage Industries ("HFI") is a Kansas general partnership and has its principal office in Hesston, Kansas. HFI consists solely of two partners: plaintiff HFI Holdings, Inc., which is a wholly owned subsidiary of Case, and plaintiff Hesston Ventures Corporation, which is a wholly owned subsidiary of AGCO.

HFI is an engineering center and a factory that designs and manufactures "hay tools" for Case and AGCO, such as square balers, round balers, pull-type mower conditioners, and self propelled windrowers. Case markets these products under the "Case IH" brand name, and AGCO markets them under the "Hesston" brand name. Except for labeling and paint color, the products HFI manufactures for Case and AGCO are identical.

#### 2. Defendant

Defendant New Holland North America, Inc. ("New Holland") is a Delaware corporation and has its principal place of business in New Holland, Pennsylvania. New Holland engineers and manufactures a full line of farm equipment: large four-wheel drive articulated tractors, compact tractors, combines, round balers, square balers, skid steer loaders, seeding equipment, grape harvesters, and others. Most importantly for purposes of this lawsuit, New Holland also manufactures a full line of hay handling equipment, including pull-type mower conditioners. The engineering work for New Holland's product line is done all over the world.

### B. General Characteristics of Mower Conditioners

The '859 patent generally describes a "mechanical drive center pivot mower conditioner." When a hay crop is ready to be harvested, the field must be cut or "mowed" to sever the standing crop materials from the ground. Mowing is typically done with either disc or sickle bar cutters. Disc cutters use rapid rotary motion, simi-

lar to a lawnmower, to sever the crop. Sickle bar mowers use back and forth motion, similar to a series of large scissors, to sever the crop. As crop is mowed, it is deposited back onto the ground in a "windrow" or "swath" to dry down the materials to a certain moisture level before baling them into a compressed package by other machines such as round or square balers. To speed up drying, it is conventional to "condition" the cut crop before it is deposited back on the ground. Conditioning is usually carried out by passing the materials between a pair of conditioning rollers that crimp and abrade the crop stems to remove a waxy substance and facilitate the escape of moisture. Pull-type machines that both mow and condition the crop are typically referred to in the industry as "mower conditioners," while self-propelled machines are more commonly known as "windrowers," although these terms are frequently used interchangeably by those skilled in the art.

Mower conditioners are designed to operate with their harvesting headers off to one side of the pulling tractor rather than directly behind the tractor. This allows the tractor to travel on previously mowed ground while the header is pulled through the standing crop. A "side pull" mower conditioner is designed to operate only on one side of the pulling tractor. Thus, a farmer using a side pull machine is not able to cut swaths going back and forth in a field without running over standing crop with the tractor. A "center pivot" mower conditioner is designed to operate on either side of the pulling tractor. A farmer using a center pivot mower conditioner is able to mow a swath in one direction and then turn the tractor around, position the mower conditioner on the other side of the tractor, and mow back in the direction opposite of the original swath without driving the tractor over uncut crop. Center pivot mower conditioners have the added benefit of greater maneuverability around obstacles in the field.

Driving power for a mover conditioner's cutting components is typically supplied in one of two ways. Hydraulic power is sometimes used, although hydraulic power can be complicated and requires extensive maintenance. The machine disclosed in the '859 patent and the defendant's accused machine both use a mechanical drive system. In these machines, mechanical power is supplied to the mower conditioner via a rotating drive line attached to the power take off mechanism, or PTO, of the pulling tractor. Mechanical drive systems generally require far less maintenance and are far less complicated than hydraulic systems.

### C. The '859 Patent

The '859 patent issued on December 28, 1993, naming Martin E. Pruitt, Cecil L. Case, and H. Keith Garrison as inventors. The application had been filed on April 14, 1992. The inventors subsequently assigned the patent to HFI.

Claim limitations central to the dispute between the parties include the "steering structure" clause of claim 1, the limitation in claim 1 requiring that the junction (gear) box pivot axis be "spaced horizontally" from the tongue pivot axis, and the entirety of claim 10. As explained in detail below, the court construed all of these limitations except the "spaced horizontally" limitation in connection with the *Markman* proceeding in *Hay & Forage I*.[3] Also playing a role in the dispute, albeit minor, is claim 11.

Claim 1 of the '859 patent is as follows: [We claim,] [i]n a pull-type crop harvesting machine, the improvement comprising:

a mobile frame;

a pull-tongue pivotally coupled with the frame for horizontal adjusting movement about a first upright axis between a number of angular positions relative to the path of travel of the machine for varying the lateral

---

**3.** The parties did not seek the court's construction of the spaced horizontally limitation in the *Markman* proceeding.

position of the machine relative to a towing vehicle;

a harvesting header supported by the frame in a position for performing harvesting operations on a crop as the machine is towed across a field,

said header having drivable operating components associated therewith;

a mechanical drive line extending along and rotatably supported by the tongue for supplying driving power to said operating components in said angular positions of the tongue;

a junction box on the header having an input shaft and an output shaft rotatably supported by the box and operably intercoupled in fixed angular relation to one another within the box,

said input shaft being operably connected with said drive line for receiving driving power therefrom and said output shaft being operably connected to said operating components for driving the same,

said box being pivotally mounted on the header for swinging movement about a second upright axis spaced horizontally from the first axis; and

steering structure connected between the junction box and the tongue for causing the junction box to swing responsively when the latter is pivoted about said first axis between its various angular positions.

Claim 10 of the '859 patent is as follows:

In a pull type harvesting machine as claimed in [claims 1, 8, and 9],

said steering structure including telescoping linkage having a front pivotal connection with the tongue at a point which is at least approximately equidistant from said opposite ends of the telescopic section.

Claim 11 of the '859 patent is as follows:

In a pull type harvesting machine as claimed in [claims 1, 8, 9, and 10],

said telescoping linkage having a rear connection with the junction box tht [sic] includes horizontal pivot means for up-and-down swinging of the linkage relative to the junction box.

In the prior *Markman* proceeding, the court construed the steering structure clause of claim 1 and the entirety of claim 10. *See Hay & Forage I,* 25 F.Supp.2d at 1176, 1179–80. The court construed the "steering structure" clause of claim 1 to mean "a steering structure separate from the drive line that operatively interacts with the tongue at one end and operatively interacts with the junction box at the other end and that transmits the swinging motion of the tongue to the junction box during swinging of the tongue." *Id.* at 1176. The court construed the "telescoping linkage" element of claim 10 to require a linkage having "overlapping sections, as if in overlapping cylindrical sections." *Id.* at 1179. The court construed the "front pivotal connection with the tongue at a point" element of claim 10 to require that the steering structure be "connected to the tongue at a spot which allows for pivotal movement." *Id.* at 1180. The court construed the "at least approximately equidistant" element of claim 10 to require a placement of the front pivotal connection "at least reasonably close to" the exact point on the tongue that is equidistant from the opposite ends of the telescoping drive line. *Id.* at 1180.

The following diagram, taken directly from the first page of the '859 patent, shows the preferred embodiment, but by no means the only conceivable embodiment, of the pertinent elements described in claims 1 and 10:

[T]he steering structure 138 comprises a tubular, telescoping linkage consisting of an inner section 140 and a concentrically disposed outer section 142. The inner tube 140 has at its forward end a ball and socket swivel connection 144 with a bracket 146 on the underside of the tongue 30. The opposite end of the inner tube 140 is slidingly received within the outer tube 142. . . .

'859 patent, col. 6, lines 17–24.

### D. The Accused Machine

New Holland entered the market with the New Holland Model 1431 mower conditioner ("1431") in the Fall of 1996, just under three years after the '859 patent issued and approximately three and a half years after the plaintiffs introduced their commercial embodiments of the '859 patent. The 1431 is similar in many respects to the machine described in the '859 patent. It is a mechanical drive center pivot disc mower conditioner. Like the device described in the '859 patent, the 1431 has a steering structure interposed between the junction box and the tongue for causing the junction box to swing responsively about an axis that is horizontally spaced from the tongue pivot axis. Plaintiffs sought summary judgment that the 1431 literally infringes claims 1, 2, 8, and 9 of

the '859 patent, and the court granted the plaintiffs' motion. *Hay & Forage III*, 25 F.Supp.2d at 1196. Accordingly, the 1431 has all the features disclosed in claims 1, 2, 8, and 9 of the '859 patent.

The parties agree, however, that under the court's *Markman* construction the 1431 does not literally infringe claims 10 and 11 of the '859 patent because the steering structure of the 1431 is constructed somewhat differently than the steering structure described in claims 10 and 11 and in the specification of the '859 patent. Instead of a telescoping linkage having a stationary front pivotal connection with the tongue, the 1431 steering structure has a fixed length arm connected to a slide plate housed in a U-shaped bracket attached to the underside of the tongue which allows the pivotal connection to slide relative to the tongue. Instead of having the pivotal connection at a spot very nearly equidistant between the opposite ends of the telescopic section of the drive line, the 1431 steering structure has a pivotal connection that slides within a range that is more to one side of the telescopic section. The following diagram depicts what the court has determined to be some of the parts that constitute the steering structure of the 1431, including the slide plate, the pivotal connection, and the fixed length arm.

Also associated with the steering structure, although not depicted above, is the bracket attached to the underside of the tongue and the opposing slide plate guides housed in the bracket in which the slide plate slides relative to the tongue.[4] The slide plate guides effectively form a channel in which the slide plate may slide along the underside of the tongue where the bracket is attached.

### E. Development Work by Marc Berlivet in Coex, France

Mr. Marc Berlivet, a French citizen, studied engineering in France and then went to work for a company in Coex, France known as Rochland S.A. in the early 1970s. Rochland S.A. manufactured and sold agricultural equipment. In the mid–1970s, Hesston Corporation ("Hesston USA") acquired Rochland S.A. and renamed it Hesston, S.A. The Hesston, S.A. facility in Coex included an engineering department, a prototype shop, and a field test department. In effect, Mr. Berlivet worked for the plaintiffs in this lawsuit during the mid– to late–1970s. Through a

series of transactions, he now, in effect, works for the defendant. Defendant claims the '859 patent is invalid because the named inventors either derived their work from Mr. Berlivet or improperly omitted Mr. Berlivet as a coinventor.

### 1. PT–8D

In 1975, Mr. Berlivet started engineering and development work in Coex on a pull-type, mechanically driven, center pivot tongue, rotary mower conditioner that became identified as the X56 project. The prototype that essentially began the X56 project was referred to as the PT–8D. The PT–8D machine had some of the features of the '859 patent, but, importantly, did not have horizontally spaced tongue and gearbox pivot axes, did not have (or require) a separate steering structure, and did not have a gearbox mounted on a header. The gearbox on the PT–8D was pivotal, but it was mounted inside the tongue such that the gearbox and tongue pivot axes were aligned. The parties produced numerous contemporaneous documents, including

---

4. The parties dispute whether the bracket and slide plate guides are part of the 1431 steering structure or merely part of the tongue. The court resolves this dispute below in connection with its resolution of plaintiff's claim of infringement of claims 10 and 11 under the doctrine of equivalents.

photographs, showing the pertinent features of the PT–8D.

### 2. X56–1

The X56–1 was the first prototype formally built under the X56 program. Contrary to the PT–8D machine, the X56–1 machine did not have a gearbox drive. Instead, the X56–1 machine included a belt and sheave drive located at the rear of the center pivot tongue and connected to a drive line that extended through the tongue. The X56–1 had some features of the '859 patent, but lacked at least a gearbox mounted on a header and steering structure connected between the junction box and the tongue. The X56–1 experienced drive line problems in field testing associated with U-joints. The parties have produced numerous contemporaneous documents, including photographs, showing the pertinent features of the X56–1.

### 3. X56–2

The X56–2 machine, also part of the X56 project, originally had the same belt and sheave drive located at the rear of the tongue as the X56–1 machine. As soon as Hesston, S.A. experienced drive line problems during field testing of the X56–1 machine, Mr. Berlivet directed the modification of the X56–2 machine. As modified, the X56–2 machine included a drive line supported underneath the tongue. The drive line was attached through a constant velocity joint to a large belt and sheave assembly located in front of the tongue axis. The X56–2 machine, however, continued to use the belt and sheave drive system and not a gearbox drive system on the header. In field testing, the X56–2 experienced significant drive line problems associated with failed U-joints. The parties have produced numerous contemporaneous documents, including photographs, showing the pertinent features of the X56–2.

### 4. X56–3

The Coex facility developed the X56–3 prototype in late 1976. It also had a belt and sheave design. The drive assembly of the X56–3 machine was similar to the drive assembly of the X56–2 machine, except that the large belt and sheave assembly was moved rearwardly relative to its placement in the X56–2 machine in an attempt to reduce the drive line angles. The X56–3 performed better than its predecessors, but still experienced drive line problems. The parties have produced numerous contemporaneous documents, including photographs, showing the pertinent features of the X56–3.

### 5. Alleged Mockups in Winter 1976–77

Mr. Berlivet testified that in late 1976 or early 1977, between the fabrication of the X56–3 machine and the X56–4 machine, he directed the preparation of three experimental mockups using the X56–2 machine as a "mule." According to Mr. Berlivet, each of these mockups involved the use of a pivoting central gearbox located on the header and a means to steer or pivot the gearbox in response to swinging movement of the tongue. There are no contemporaneous documents or photographs that show the pertinent features of these mockups. The court will discuss the alleged mockups in greater detail in connection with its findings and analysis on the derivation and coinventorship issues.

### 6. X56–4

Unlike the X56–1, –2, and –3 machines, the X56–4 machine had a stationary (non-pivoting) gearbox affixed to the header. The drive line of the X56–4 machine included a telescopic section connected between the fixed gearbox and the primary shaft supported underneath the tongue. A double yoke support assembly mounted to the underside of the tongue and a second double yoke support assembly mounted to the header in front of the fixed gearbox cooperatively supported the telescopic portion and accommodated drive line angles between the primary shaft and the fixed gearbox. The X56–4 did not include a junction box pivotally mounted on the header for swinging movement about an axis horizontally spaced from the tongue pivot axis. It also did not include steering structure. The parties have produced numerous contemporaneous documents, in-

cluding photographs, showing the pertinent features of the X56–4.

### 7. X56–5

Mr. Berlivet testified that he directed the preparation of the X56–5 machine around the same time the X56–4 machine was being produced. Around the same time, however, Hesston USA and Hesston S.A. decided to move away from the center pivot concept and focus on developing a side pull mower conditioner. According to the testimony of Mr. Berlivet concerning the X56–5, the X56–5 had every limitation of claim 1 of the '859 patent. There are no contemporaneous documents or photographs that show the pertinent features of the X56–5. The court will discuss the X56–5 in greater detail in connection with its findings and analysis on the derivation and coinventorship issues.

### F. Prior Art

#### 1. Niemeyer 1570

Defendant contends that independent claim 1 and dependent claims 2, 8, and 9 of the '859 patent are invalid because they were anticipated by a hay harvesting machine manufactured by H. Niemeyer Sohne GmbH & Co. KG, a German concern. Specifically, defendant contends that the Niemeyer RO 301–GK machine, serial number 1570 ("Niemeyer machine"), anticipates claim 1 of the '859 patent and the claims dependent thereon.

Like the device described in the '859 patent, the Niemeyer machine is a mechanical drive center pivot mower conditioner. The parties have agreed that the machine was on sale or in public use prior to April 14, 1991, one year before the application for the '859 patent was filed, but they have not agreed that the machine as it exists today is in substantially the same condition as it was on April 14, 1991.

#### 2. '418 Patent

On its face, the '859 patent cites United States Patent No. 4,858,418 ("'418 patent"), issued August 22, 1989. The parties agree that the '418 patent is pertinent prior art. Plaintiffs concede that the '418 patent discloses each and every element of claims 1, 2, 8, and 9 of the '859 patent except the steering structure element of claim 1. Figures 1, 2, and 3 of the '418 patent appear below:

As the figures show, the '418 machine has a pivoting gearbox, horizontally spaced tongue and gearbox pivot axes, and a telescoping drive line, but lacks a steering structure for the gearbox that is connected to the tongue and separate from the drive line. Instead of having a separate steering structure as disclosed in the '859 patent, the mechanical drive line (5, 5a), along with a forked support joint (14) steer the gearbox as the tongue swings.

In effect, the forked support joint mechanism allows for vertical movement of the gearbox while resisting horizontal movement. The support joint also helps the machine resist torque that tends to rotate the gearbox during operation. To serve these functions, the rear part of the forked support joint is rigidly secured to the gearbox. The front portion (24) of the forked support joint includes a bearing rotatably supporting the drive line section (5a). The front portion of the forked support joint is connected to the rear portion through pivot pins (15') which allow for vertical movement.

A person of ordinary skill in the art would understand the '418 patent to have certain undesirable features. Using the drive line to steer the gearbox introduces detrimental bending loads into the drive line and the bearings that support it. Moreover, using the drive line to resist torque from the operating components subjects the drive line and bearings to harmful loads.

### 3. Australian Patent

The parties agree that Australian Patent No. 108,592 ("Australian patent"), issued in 1939, is pertinent prior art. The Australian patent discloses a harvester machine and an improved power take off for connecting the drive line to a tractor. As shown in the figure below, the patent discloses a gearbox with a fixed lower portion 9 and a rotating or pivoting upper portion 17.

The patent also discloses a torque rod 33 which is pivotally attached to the upper housing 17 at one end and slidably disposed through a bracket 37 at the other end. As described in the specification, the purpose of the torque rod 33 is to rotate the upper half of the gearbox housing when the tractor turns, to keep the output shaft of the gearbox in its housing when the tractor turns, and to resist torque in the rotatable housing.

### 4. New Holland 601–611 Forage Harvesters

The parties agree that 1950s publications describing the defendant's Model 601–611 Forage Harvesters ("New Holland forage harvesters") disclose pertinent pri-

or art. The New Holland forage harvesters are pull-type harvesters with driving power supplied through the tractor PTO. The harvesters are designed to cut crops such as hay and corn. A cutting mechanism severs the crop which feeds up through an elongated upright spout and blows into a wagon trailing behind the harvester. A draw bar or tongue connects the wagon to the harvester.

The upright spout on the New Holland forage harvester pivots in order to keep the spout generally aligned with the wagon when the tractor pulling the harvester and wagon turns a corner or otherwise follows field contours. A telescoping steering linkage called a deflector guide allows the spout to pivot in the proper direction. The deflector guide has a pivotal connection to the wagon tongue at one end and a horizontal pivotal connection to the rotating spout at the other end.

### 5. Dickensheid Patent

The parties agree that United States Patent No. 2,864,517 to Dickensheid ("Dickensheid patent"), issued in 1958, is pertinent prior art. The Dickensheid patent is similar to the New Holland forage harvesters in that it discloses a "spout locator" for a pull type harvester designed to be used with a trailing wagon. The spout locator is an arm or lever that is connected by a horizontal pivot to a bracket attached to a pivoting discharge chute at one end and slidingly engaged to the wagon tongue at the other end. As explained in the patent, as the harvester turns during field operation, the lever responsively turns the spout for correct positioning over the wagon.

### 6. Eberly Patents

The parties agree that United States Patent 2,789,705 to Eberly ("Eberly '705 patent"), issued in 1957, and United States Patent 2,762,517 to Eberly ("Eberly '517

patent"), issued in 1956, are pertinent prior art. Like the New Holland forage harvesters and the Dickensheid patent, the Eberly patents disclose steering structures for pivoting the spouts on pull type forage harvesters with trailing wagons.

### 7. Dutch Patent

The parties agree that Dutch Patent NL 8700863–A ("Dutch patent") published in November, 1988, is pertinent prior art.[5] The Dutch patent discloses a side pull rotary mower conditioner. A pivoting gearbox is located on top of the tongue near the pulling tractor. The pivoting gearbox receives driving power from the tractor PTO through a short telescoping drive line. The gearbox directs driving power down vertically into the tongue, where a belt and pulley system convey power to the cutting components of the machine. A steering linkage steers the pivoting gearbox so that the gearbox input shaft stays generally aligned with the drive line during turning or swinging of the tongue. The steering linkage is pivotally attached to the gearbox housing at one end and slidingly engages in a hole at the other end. The hole is associated with the tractor/implement hitch, so that force is applied to the steering linkage when the tractor turns.

### 8. Deere Patents

The parties agree that Untied States Patent Nos. 3,557,892, 4,008,905, and 4,195,704, issued in 1971, 1977, and 1979, respectively, and all assigned to John Deere ("Deere patents"), are pertinent prior art. These patents disclose an adapter for a tractor to implement hitch whereby a vertical pivot axis is placed at the midpoint of two universal joints at opposite ends of a telescoping drive line. In the Deere '892 patent, for example,

---

**5.** Defendant's expert, Mr. Campbell, was only allowed to testify concerning the figures shown in this patent. He was not allowed to testify concerning the text of the patent because his testimony concerning the English translation of the patent had not properly

been disclosed in his Rule 26 reports. Nonetheless, the court evaluates the patent as pertinent prior art because the patent itself, along with its English translation, is in evidence and because the parties have fully briefed and argued the patent's ramifications.

an adapter is provided for connecting the implement tongue to the tractor drawbar, whereby the axis of articulation is provided equidistantly between the end of the PTO shaft and the implement input drive shaft, providing equiangular articulation at the front and rear universal joints in the drive line connecting assembly and thereby providing constant speed in the implement drive line regardless of the angle of articulation between the tractor and implement.

Deere '892 patent, col. 2, lns. 19–27. A figure from the '892 patent is shown below:

### 9. Kuhn Patent

The face of the '859 patent discloses United States Patent No. 5,060,462, assigned to Kuhn, S.A. of Saverne, France ("Kuhn Patent"). The Kuhn patent discloses a center pivot mower conditioner with generally aligned tongue and gearbox pivot axes. Kuhn, S.A. created a commercial embodiment of this patent—the Kuhn Alterna 500.

### 10. Other Patents

The parties apparently agree that the other patents cited on the face of the '859 patent are prior art. Because the parties do not address their arguments to any of these patents, the court simply acknowledges them as prior art in the record without further exposition.

### G. Defendant's Design Efforts

### 1. Creation of the 1431

The plaintiffs' commercial embodiments of the '859 patent were a huge commercial success. The plaintiffs went from a very small market share to approximately a fifty percent market share in only four years.

Defendant had not been heavily focusing on the center pivot design at the time of the '859 patent because its long term marketing and design plans led it to focus on what it termed the "modular cutterbar" system. In lay terms, the modular cutterbar system was a way to drive individual elliptical-shaped rotary cutters independently of the other rotary cutters, while still timing the rotation of the cutters so that the ellipses would overlap to avoid missing crop. The benefits of the modular cutterbar system included less down time for farmers because problems with individual cutterbars could be isolated and would thus not cause catastrophic failure to the entire gear system.

When defendant learned of the plaintiffs' machines and began to realize how successful they were, the defendant began attempts to design a center pivot mechani-

cal drive machine. The defendant's first attempt at a center pivot machine was essentially a copy of the plaintiffs' machines. The defendant's first attempt featured a horizontally spaced pivoting gearbox and a telescoping steering structure connected between the gearbox and the tongue at a point approximately equidistant from the opposite ends of a telescoping drive line.

When the defendant became aware of the '859 patent, it went back to the drawing board and attempted to design a center pivot machine with a hydraulic drive system instead of a mechanical drive system. These attempts were wholly unsuccessful.

The defendant finally arrived at the design reflected in the New Holland 1431, the accused machine, after scrapping the hydraulic drive idea. The defendant apparently took great pains to try to design around the '859 patent when it designed the 1431 because there were a flurry of communications between the defendant's engineering department and its patent counsel around the time the 1431 was conceived.[6]

#### 2. Ken McLean

In 1987, Ken McLean of New Holland's engineering department conceived of a pivot tongue rotary mower conditioner, having a pivoting gearbox and a telescoping steering linkage connected to the tongue. Mr. McLean's concept is largely identical to the steering structure disclosed in the '859 patent. The only pertinent conceptual difference between Mr. McLean's idea and the '859 patent is the limitation in claim 10 of the patent that the front pivotal connection of the steering structure at the tongue be at a point approximately equidistant between the opposite ends of the telescoping drive line. Mr. McLean's idea

shows the connection much closer to one end of the drive line, away from any point of approximate equidistance. Although Mr. McLean envisioned his concept as an improvement to a side pull machine rather than a center pivot machine,[7] there is no dispute that his concept would have worked on a center pivot machine as well.

Mr. McLean submitted an invention disclosure form to the New Holland patent department. New Holland retained the concept under consideration for possible pursuit of a patent for a period of time, but ultimately rejected it in early 1990. The parties dispute the precise reason for the rejection,[8] but there is no dispute that both Mr. McLean and the New Holland patent department had at least considered the ramifications of the Australian patent on the patentability of Mr. McLean's idea.

### II. Infringement of Claims 10 and 11

Plaintiffs claim that the New Holland Model 1431 infringes claims 10 and 11 of the '859 patent under the doctrine of equivalents. The court concludes that the 1431 does not infringe claims 10 and 11 because it does not have the substantial equivalent of the "telescoping linkage" limitation.

#### A. Legal Framework

██ "A determination of infringement requires a two step analysis. First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed.Cir.1998). As noted above, the court has already performed the first step. *See Hay & Forage*, 25 F.Supp.2d at 1172–80.

**6.** The plaintiffs characterize the defendant's efforts to design around the patent as blatant copying. To the extent this distinction makes a difference, the court resolves it in its discussion of obviousness below.

**7.** New Holland was not actively pursuing the center pivot concept in 1987. Mr. McLean's

idea came about because of a desire to allow New Holland's Model 411 side pull machine to enjoy some swinging motion while the drive line was operating.

**8.** A January 10, 1990 document purports to reject any further pursuit of the idea "due to cost and complexity."

"The second step of the infringement analysis, determining whether a particular device infringes a properly construed claim, is a question of fact." *Ethicon Endo–Surgery, Inc.,* 149 F.3d at 1315.

◼ A product that does not literally infringe the express terms of a patent claim may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product and the elements of the claim. *Id.* (citing *Warner–Jenkinson,* 117 S.Ct. at 1045).

> Infringement may be found under the doctrine of equivalents if every limitation of the asserted claim, or its "equivalent," is found in the accused subject matter, where an "equivalent" differs from the claimed limitation only insubstantially. Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination.

*Ethicon,* 149 F.3d at 1315. The former of these analyses is often referred to as the "insubstantial differences" approach. *Warner–Jenkinson,* 117 S.Ct. at 1054. The latter is often referred to as the "triple identity" or the " function/way/result" approach. *Id.* The triple identity approach is thought to be particularly suitable for analyzing mechanical devices, such as the device disclosed in the '859 patent.

The Supreme Court recently rejected a direct challenge to the doctrine of equivalents. *See id.* at 1045 ("Petitioner … invites us to speak the death knell of [the] doctrine [of equivalents]. We decline that invitation."). The Court recognized that "[t]he doctrine of equivalents, when applied broadly, conflicts with the definitional and public notice functions of the statutory claiming requirement." *Id.* at 1048. The Court upheld the doctrine, however, teaching that courts must remain vigilant in their application of, inter alia, the "All Elements" rule to avoid the potential conflict. *See Ethicon,* 149 F.3d at 1315 (quoting Warner–Jenkinson, 117 S.Ct. at 1054

("The determination of equivalence should be applied as an objective inquiry on an element-by-element basis.")). One of the purposes of the doctrine of equivalents is to protect inventors from unscrupulous copying or from making insubstantial changes between the claimed and accused products or processes. *Hilton Davis Chemical Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1519 (Fed.Cir.1995), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Kinzenbaw v. Deere & Co.,* 741 F.2d 383, 389 (Fed.Cir. 1984).

### B. Analysis

#### 1. Inclusion of Bracket and Slide Plates in 1431 Steering Structure

The parties hotly contest whether the bracket attached to the tongue and the slide plate guides housed in the bracket that receive the slide plate are part of the 1431 steering structure. Defendant argues that the steering structure consists only of the components shown in the figure *supra* at page 1108; that is, defendant argues that the steering structure does not include the bracket and slide plate guides. Plaintiffs argue that the steering structure includes the bracket and slide plate guides. Defendant's expert, Mr. Willis Campbell, testified that the bracket and slide plate guides are part of the tongue and not part of the steering structure. Plaintiffs' expert, Mr. James Pope, testified that the bracket and slide plate guides are part of the steering structure. Defendant impeached Mr. Pope's opinion at trial by noting Mr. Pope had given an expert report earlier in this case stating that the bracket is part of the tongue. Moreover, there was some evidence that defendant distributes the tongue and bracket and slide plate guide assembly as one part.

The court concludes that the bracket and slide plate guides are part of the steering structure. The court finds Mr. Pope's opinion at trial more persuasive than Mr. Campbell's opinion on this issue

because Mr. Campbell did not articulate any reason why the 1431 would require a bracket and slide plates on the underside of the 1431 tongue other than to accommodate steering. The court discounts the evidence of how defendant distributes the part assembly because the evidence simply has nothing to do with the function of the parts. Accordingly, the court will evaluate the parties' factual arguments concerning the doctrine of equivalents with the premise that the bracket, the slide plate guides, the slide plate, the pivotal connection with a ball joint, and the fixed length arm are all part of the steering structure of the 1431 machine.

### 2. Claim 10 and the All Elements Rule

■ Evaluating the limitations found in claim 10 under the all elements rule, the court concludes that the 1431 machine does not infringe claim 10 under the doctrine of equivalents. The three disputed limitations in claim 10 are the "telescoping linkage" limitation, the "pivotal connection with the tongue at a point" limitation, and the "at least approximately equidistant" limitation. Although the court concludes that the pivotal connection at a point limitation and the approximately equidistant limitation are equivalently present in the 1431 steering structure, the court concludes that there are substantial differences between the telescoping linkage limitation in the patent and the sliding plate mechanism used in the 1431. Moreover, the court concludes that although the sliding plate mechanism used in the 1431 has the same function and the same result as the telescoping linkage limitation, it does not operate in the same way as the telescoping linkage limitation.

### a. Pivotal Connection with the Tongue at a Point

First, the court concludes that the 1431 steering structure's connection to the tongue is substantially equivalent to the pivotal connection with the tongue limitation of claim 10. The court interpreted claim 10 to require the steering structure to be connected to the tongue "at a spot which allows for pivotal movement." *Hay & Forage I*, 25 F.Supp.2d at 1180. The steering structure on the 1431 is connected to the tongue through the bracket which houses the slide plate guides and, in turn, the slide plate. A ball joint connected to the slide plate allows for pivotal movement of the fixed-length steering arm. The slide plate mechanism allows the pivot point to vary relative to the tongue as the angle of the tongue and gearbox changes.

Although the pivot point on the 1431 is at a different "spot" relative to the tongue at any given tongue angle, the court believes the differences between the 1431 configuration and the pivotal connection at a point limitation in the '859 patent are insubstantial because the pivot point on the 1431 is at only one spot relative to the tongue at any given tongue angle. That is, even though the spot on the 1431 moves relative to the tongue, it is still a spot that allows for pivotal motion. Moreover, the configurations perform substantially the same function in the substantially the same way to achieve substantially the same result. The function of both configurations is to connect the steering linkage to the tongue and at the same time allow pivotal movement of the steering linkage relative to the tongue. The way this is done in both configurations is through a pivot point that allows for the steering structure to rotate. The result obtained is to allow the steering linkage to swing in different arcs while still transmitting the tongue motion to the gearbox.

### b. Approximately Equidistant

Next, the court concludes that the location of the 1431 steering structure's connection point is substantially equivalent to the approximately equidistant limitation of claim 10. The court interpreted the approximately equidistant limitation of claim 10 to require a connection point that is "at least reasonably close to the exact point on the tongue that is equidistant from the opposite ends of the telescoping driveline." *Hay & Forage I*, 25 F.Supp.2d at 1180. Also, a person of ordinary skill in the art, by looking at the drawings and specifica-

tion of the '859 patent,[9] would recognize that

> the geometry by which the exact center point is measured changes as the drive line telescopes. As the tongue swings [in the figure shown below], the distance between the connection point 144 and the U-joint 110 changes (in conjunction with the telescoping of the steering structure), but the distance between the connection point 144 and the U-joint 104 stays the same. Consequently, the imaginary exact point of equidistance moves a short distance away from the connection point 144.

*Hay & Forage II*, 25 F.Supp.2d at 1175.

*Fig.6.*

'859 patent, figure 6. Accordingly, the exact point of equidistance is a moving target due to the telescoping characteristic of the drive line.[10]

The court concludes that the location of the 1431 steering structure's connection point is substantially equivalent to the approximately equidistant limitation of claim 10 because it believes there are only insubstantial differences between the location of the 1431 pivot point at any given positioning of the tongue and the limitation set forth in the patent. Defendant exerted great effort at trial to show that the 1431 pivot point never reaches the exact midpoint of the 1431 telescoping drive line. Although the court finds that the 1431 pivot point always is some distance from the imaginary exact midpoint, and the court further finds that the 1431 pivot point always is a greater distance from the imaginary exact midpoint than plaintiff's commercial embodiments of the '859 patent, the court believes the differences between the 1431 and the pertinent limitation in claim 10 to be insubstantial because the location of the pivot point relative to the tongue on the 1431 achieves substantially the same function in substantially the same way to achieve substantially the same result. The location of the pivot point in both configurations achieves the function of substantially equalizing U-joint angles at opposite ends of the telescoping drive line when the tongue and drive line are swung fully to their normal operating

9. Claims must be read in light of the patent specification. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir. 1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

10. The fact that the exact point of equidistance in the '859 patent is a moving target lends further credence to the court's factual finding that the 1431 sliding pivot is only insubstantially different from the '859 patent's pivotal connection at a point limitation.

positions.[11] The way this is done in both configurations is by locating the pivotal connection relative to the tongue at a spot that is sufficiently close to a point equidistant from opposite ends of the drive line to take advantage of the resultant geometric relationship between the tongue, drive line, and steering structure. The result achieved by both configurations is the avoidance of untoward torsional forces on the drive line.

### c. Telescoping Linkage

Notwithstanding the court's findings concerning the pivotal connection at a point and the approximately equidistant limitations, the court concludes that the 1431 steering linkage is not substantially equivalent to the telescoping linkage limitation of claim 10. The court construed the telescoping linkage limitation of claim 10 to require "a linkage having overlapping cylindrical sections." Plaintiffs assert, and Mr. Pope testified, that the slide plate and the opposing slide plate guides housed within the U-shaped bracket under the tongue are substantially equivalent to a linkage having overlapping cylindrical sections. The court disagrees because no aspect of the sliding linkage approximates overlapping cylinders. The slide plate guides, as previously stated, create a channel in which the slide plate moves. This channel is not cylindrical, nor is it entirely enclosed in the way overlapping cylinders would enclose one cylinder within another.

Moreover, although the 1431 sliding mechanism has substantially the same function[12] and achieves substantially the same result[13] as the telescoping linkage limitation in the '859 patent, it does not operate in substantially the same way. The sliding linkage in the 1431 slides in a plane parallel to the plane defined by the underside of the tongue, whereas the telescoping linkage of claim 10 slides along an axis defined by the stationary connection point on the tongue and the junction box. In the triangle defined by the following three points, (1) the pivot point, (2) the end of the telescoping drive line closest to the tractor ("U-joint 3"), and (3) the end of the telescoping drive line closest to the gearbox ("U-joint 4"), the sliding linkage in the 1431 and the telescoping linkage in claim 10 operate in a substantially different way. The sliding linkage in the 1431 allows the distance between the pivot point and U-joint 3 to vary while keeping the distance between the pivot point and U-joint 4 fixed, whereas the telescoping linkage in claim 10 allows the distance between the pivot point and U-joint 4 to vary while keeping the distance between the pivot point and U-joint 3 fixed. In effect, the triangle in the 1431 has been "flipped" relative to the comparable triangle in claim 10. The court believes this distinction supports its conclusion that the two configurations operate in a substantially different way.

### 3. Claim 11

■ The court's conclusion that the 1431 does not infringe claim 10 under the doctrine of equivalents compels a similar conclusion with respect to claim 11, because claim 11 is dependent upon claim 10. One who does not infringe a claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim. *See, e.g., Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed.Cir. 1994) (citing *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir.1989) ("It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to be infringed.")).

11. As will become apparent later in this opinion, the substantial equalization of U-joint angles in the drive line is important to the overall drive line performance of the mower conditioner.

12. The function of the linkage in both configurations is to allow the total length of the steering structure to vary as the tongue is swung throughout its various positions.

13. The result achieved by both configurations is to accommodate swinging of the tongue and the concomitant movement of the horizontally spaced gearbox.

## IV. Invalidity Generally

The court presumes the '859 patent to be valid:

A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it.

35 U.S.C. § 282. The purpose of the statutory presumption is to "contribute stability to the grant of patent rights." *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 958 (Fed.Cir.1997). The presumption of validity places the burden of proof of facts and the ultimate burden of persuasion to establish invalidity on the party asserting that a claim is invalid. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 885 (Fed.Cir.1988).

 A party challenging a patent's validity has the burden to show invalidity by clear and convincing evidence. *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1189 (Fed.Cir.1996). Clear and convincing evidence involves a greater degree of persuasion than that which will satisfy a preponderance of the evidence standard, albeit a lesser standard than beyond a reasonable doubt. Clear and convincing evidence is evidence that creates in the fact finder's mind an abiding conviction that the truth of a factual contention is highly probable. *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984). If the evidence requires the fact finder to draw extensive inferences, the evidence does not satisfy the clear and convincing proof requirement. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir.1991).

## V. Invalidity Pursuant to 35 U.S.C. § 102(b)

Defendant contends that the Niemeyer machine anticipates claims 1, 2, 8, and 9 of the '859 patent. Plaintiffs concede that the Niemeyer machine meets the on sale or public use requirements of section 102(b). Plaintiffs argue, however, that defendant has not met its burden to show by clear and convincing evidence that the Niemeyer machine anticipates the following three claim 1 limitations: (1) a header supported by the frame as claimed in claim 1, (2) a steering structure "separate from the drive line" as claim 1 has been construed by the court, and (3) a gearbox axis "spaced horizontally" from the tongue pivot axis as required by claim 1. Plaintiffs also claim that, even if the Niemeyer machine now has horizontally spaced axes, the defendant has not met its burden to prove by clear and convincing evidence that the Niemeyer machine had horizontally spaced axes on or before the critical date of April 14, 1991.

The court concludes that the Niemeyer machine does not anticipate any claims of the '859 patent. Although the Niemeyer machine anticipates the header supported by the frame limitation and the steering structure separate from the drive line limitation, the Niemeyer machine does not anticipate the limitation requiring the gearbox pivot axis to be spaced horizontally from the tongue pivot axis. Because it does not anticipate independent claim 1, the Niemeyer machine also does not anticipate dependent claims 2, 8, and 9.

### A. Legal Framework

 Anticipation is a question of fact. *Id.* A patent is invalid because of anticipation when the patent challenger can show by clear and convincing evidence that "the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent...." 35 U.S.C. § 102(b); *Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1052 (Fed.Cir.1994). Anticipation requires the presence of each and every element of a claimed invention within a single prior art disclosure. *Id.* Put another way, "[t]hat which would literally infringe if later in time anticipates if earli-

er than the date of the invention." *Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 747 (Fed.Cir.1987) (emphasis omitted).

## B. Analysis: Claim 1

### 1. Horizontally Spaced Pivot Axes

■ The court concludes that the Niemeyer machine does not anticipate the horizontally spaced pivot axes limitation of claim 1 because the alleged horizontal spacing was entirely accidental, not intended, and not appreciated. The Niemeyer machine, as it exists today, unquestionably has gearbox and tongue pivot axes that are spaced a tiny distance apart.[14] Moreover, the defendant has proven by clear and convincing evidence that the Niemeyer machine as it existed on the critical date likely had similarly spaced axes. Nonetheless, the court finds that the evidence is overwhelming that the designers of the Niemeyer machine intended the gearbox pivot axis and tongue pivot axis to coincide and did not appreciate the significance of horizontal spacing.

Defendant has proven by clear and convincing evidence that the tongue and gearbox pivot axes on the Niemeyer machine likely had some small and unintentional amount of horizontal spacing on or before the critical date. The Niemeyer machine, which defendant produced at trial, today clearly has some minute spacing between the gearbox pivot axis and the tongue pivot axis. The spacing amounts to no more than a few millimeters. Although some of this spacing might have been caused by wear and tear on the machine, Mr. Ungruh, the designer of the Niemeyer machine, testified that every RO 301–GK machine built by Niemeyer, including the Niemeyer 1570 machine produced at trial, had a tongue pivot axis that was marginally spaced apart from the gearbox pivot axis. Mr. Ungruh testified, and the parties agreed, that Niemeyer manufactured its machine using a cut and weld technique, which would not have allowed for precise alignment between the axes except by fortuitous accident. Mr. Ungruh's testimony is corroborated by the existence in the Niemeyer machine of a telescoping drive line—a feature apparently only necessary in the Niemeyer machine to accommodate for relative movement between the tongue and the gearbox.

Despite the minute horizontal spacing, the court concludes that the Niemeyer machine does not anticipate claim 1. "[A]ccidental results, not intended and not appreciated, do not constitute anticipation." *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523 (1923), *cited in Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 156 F.3d 1193, 1198 (Fed.Cir.1998) ("[A]n accidental or unwitting duplication of an invention cannot constitute an anticipation."). The court is convinced that even if the Niemeyer machine has horizontally spaced axes as contemplated by claim 1 of the '859 patent,[15] these results were accidental. Mr. Ungruh clearly testified that the horizontal spacing was not intentional but, rather, was accepted as practical reality in light of the necessity to allow for manufacturing tolerances with the imprecise cut and weld technique. Moreover, Mr. Ungruh and others associated with the Niemeyer machine clearly did not appreciate the significance of horizontally spaced axes because the tiny spacing simply did not produce a significant result. Figure 9 of the German patent application associated with the Niemeyer machine shows these axes in precise alignment. Mr. Ungruh testified that he designed the gearbox and tongue pivot axes to be identical.

---

14. The court offers no opinion concerning whether the quantity or quality of horizontal spacing in the Niemeyer machine literally would meet the properly construed limitation of "spaced horizontally." The court avoids construing the claim as a matter of law because it believes the Niemeyer issue can be resolved on more narrow legal grounds.

15. Again, the court expresses no opinion concerning whether the spacing in the Niemeyer machine would literally meet the spaced horizontally limitation properly construed.

## 2. Steering Structure

Claim 1 of the '859 patent calls for a steering structure "connected between the junction box and the tongue for causing the junction box to swing responsively about said [junction box] axis with the tongue when the latter is pivoted about said [tongue] axis between its various angular positions." The court has construed this limitation to mean "a steering structure separate from the drive line that operatively interacts with the tongue at one end and operatively interacts with the junction box at the other end and that transmits the swinging motion of the tongue to the junction box during swinging of the tongue." *Hay & Forage I*, 25 F.Supp.2d at 1176.

The court concludes that defendant has met its burden to show by clear and convincing evidence that the Niemeyer machine anticipates the steering structure separate from the drive line limitation as that limitation has been construed by the court. The gearbox on the Niemeyer machine has a specially designed cover with a long nose that interacts with the tongue. As Mr. Ungruh testified, the long nose serves the function of steering the gearbox in response to the swinging motion of the tongue. Mr. Ungruh also testified that the gearbox cover on the Niemeyer machine was specially designed to steer the gearbox and was not a standard gearbox part. The following diagram shows a conceptual comparison between a standard gearbox cover and a gearbox cover with a long nose for steering. The gearbox cover in the top drawing approximates the design of the gearbox cover on the plaintiffs' commercial embodiment of the '859 patent, and the gearbox cover in the bottom drawing approximates the design of the gearbox cover on the Niemeyer machine.

## STANDARD RIGHT ANGLE GEARBOX AND COVER PLATE
### CASE 8312

## NIEMEYER SN 1570 GEARBOX AND STEERING CASTING

The long nose fits inside the tongue and serves to swivel the gearbox as the tongue swings about the tongue pivot axis. Accordingly, the gearbox cover "operatively interacts with the tongue at one end and operatively interacts with the junction box at the other end and ... transmits the swinging motion of the tongue to the junction box during swinging of the tongue."

Plaintiffs' arguments against recognizing the gearbox cover as a steering structure within the meaning of claim 1 are essentially twofold. First, plaintiffs argue that the gearbox cover is part of the gearbox and thus cannot operatively interact with the gearbox. Second, plaintiffs argue that the part's designation as a gearbox cover precludes it from serving as a steering structure. The court rejects both arguments. As Mr. Campbell testified, the gearbox cover serves multiple purposes, one of which is to steer the gearbox. Nothing about this multiple functionality precludes the gearbox cover from being a steering structure. Moreover, the court affords little weight to the name given the part in the parts manual. The gearbox cover is clearly a gearbox cover as indicated in the Niemeyer parts manual, but it also serves to steer the gearbox. The court concludes that the Niemeyer ma-

chine anticipates the steering structure limitation disclosed in claim 1 of the '859 patent.

### 3. Header Supported by the Frame

Claim 1 of the '859 patent calls for "a harvesting header supported by the [mobile] frame in a position for performing harvesting operations on a crop as the machine is towed across a field." The harvesting header claim language is straightforward, and basically describes the crop harvesting portion of the machine, which includes at least a frame and parts for cutting or severing the crop. The patent specification defines the header in broad, functional terms:

> Supported by the frame 12 beneath the swing tongue 30 is a harvesting header broadly denoted by the numeral 50. [See *supra*, the figure at page 13.] In accordance with the principles of the present invention, the header 50 may be constructed in a number of different ways to perform a number of different functions. In the illustrated embodiment, the header 50 is designed to both mow or cut the standing crop and condition the crop before returning the cut crop to the ground in a windrowed or swathed condition. It will be understood, however, that the principles of the present invention are not limited to a machine which both mows and condition [sic] the crop, i.e. to a mower/conditioner.

> The header 50 has a frame of its own which can be described as being of generally open, box-like construction in a rectangular configuration.

The court concludes that defendant has met its burden to show by clear and convincing evidence that the Niemeyer machine anticipates the header supported by a mobile frame limitation of claim 1. The header frame assembly in the Niemeyer machine is separate from the machine frame assembly. The following two figures from the Niemeyer parts catalogue show the parts defendant claims constitute the header assembly and the parts defendant claims constitute the frame assembly in the Niemeyer machine. The machine frame is denoted by item 1 in the first figure, and the header frame weld assembly is denoted by item 1 in the second figure.

The header frame is supported by the machine frame because it is bolted to the machine frame. The above figures show the holes through which the bolting occurs. The header frame shown in the second figure is described as a "gearbox" in the Niemeyer parts manual, but it is the same part as the header frame described in the specification of the '859 patent, because it supports the pivoting gearbox above it, houses the cutter drive system, and supports the cutters below in a position for performing harvesting operations as the machine is towed across a field. Moreover, the tongue is pivotally mounted on the machine frame, while the pivoting gearbox is mounted on a separate part—the header frame. The court has no hesitation in concluding that the Niemeyer machine anticipates the separate header limitation of claim 1.

### D. Analysis: Claim 2, 8, and 9

Claims 2, 8, and 9 also are not invalid for anticipation. Defendant has not advanced separate proofs with respect to these claims, arguing instead that if claim 1 is invalid for anticipation, then claims 2, 8, and 9 are invalid also. Given the court's conclusion that claim 1 is not anticipated, the court concludes that claims 2, 8, and 9 are not anticipated.

## VI. Invalidity Pursuant to 35 U.S.C. § 102(f); Related Theories

Defendant argues that the '859 patent is invalid either because it was derived from Mr. Berlivet's work, *see* 35 U.S.C. § 102(f) ("A person shall be entitled to a patent unless … he did not himself invent the subject matter sought to be patented."), or because Mr. Berlivet was improperly omitted as a named co-inventor. The court concludes that the patent is not invalid pursuant to these theories because defendant has not met its burden to prove by clear and convincing evidence that Mr. Berlivet conceived of the idea behind the '859 patent, nor has defendant met its burden to prove by clear and convincing evidence that Mr. Berlivet contributed to the conception of the invention.

### A. Legal Framework

#### 1. Derivation

 A claim that a patentee derived an invention from another addresses the issue of originality: "[w]ho invented the subject matter?" *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed.Cir.1993). A derivation defense amounts to a claim that the named patentee did not invent the subject matter of the patent because the patentee derived the invention from another. *Id.* A party asserting invalidity of a patent because of derivation must show by clear and convincing evidence both conception of the invention by another and communication of the invention to the patentee. *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed.Cir.1997) (citing *Price*, 988 F.2d at 1190). The ultimate question of whether a patentee derived an invention from another is one of fact, but the determination of whether there was a prior conception is a matter of law based on subsidiary factual findings. *Price*, 988 F.2d at 1190 (citations omitted).

Conception is "the touchstone of inventorship." *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 278, 142 L.Ed.2d 229 (1998). It is the "formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is here-after to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir.1986). "Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1228 (Fed.Cir.1994). Conception must include every feature of the claimed invention. *Burroughs Wellcome*, 40 F.3d at 1228 (citing *Coleman v. Dines*, 754 F.2d 353, 359 (Fed.Cir.1985).)

The party challenging the patent must also show that the purported inventor communicated his or her idea to others. The inventor must be shown to have disclosed to others his or her "complete thought expressed in such clear terms as to enable those skilled in the art to make the invention." *Coleman*, 754 F.2d at 359.

 Both conception and communication, in order to satisfy the challenger's burden of proof by clear and convincing evidence, must be proven by more than merely the purported inventor's testimony. *Price*, 988 F.2d at 1194 ("[A]n inventor's testimony respecting the facts surrounding a claim of derivation … cannot, standing alone, rise to the level of clear and convincing proof. Throughout the history of the determination of patent rights, oral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism."). Accordingly, corroborating evidence is required to support claims of derivation. The Federal Circuit has taught that evaluating corroborating evidence requires application of a "rule of reason" analysis. *Id.* at 1195. Under the rule of reason, all pertinent evidence must be evaluated so that a sound determination of the credibility of the inventor's story may be reached. *Id.* Factors pertinent to the rule of reason analysis include: "(1) the relationship between the corroborating

witness and the alleged prior user, (2) the time period between the event and trial, (3) the interest of the corroborating witness in the subject matter in suit, (4) contradiction or impeachment of the witness' testimony, (5) the extent and details of the corroborating testimony, (6) the witness' familiarity with the subject matter of the patented invention and the prior use, (7) probability that a prior use could occur considering the state of the art at the time, [and] (8) impact of the invention on the industry, and the commercial value of its practice." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed.Cir.1998) (citation omitted). The Federal Circuit has held that circumstantial evidence about the inventive process may corroborate an inventor's testimony. *Ethicon, Inc.*, 135 F.3d at 1461. The Federal Circuit has also held that an entry in a date book concerning a party at which a purported inventor assertedly demonstrated her invention to others, coupled with the physical production of the invention at trial and the testimony of friends who attended the party, was sufficient corroborating evidence of prior public use to support a jury verdict of invalidity under the prior public use doctrine. *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1159–60 (Fed. Cir.1994). In rare cases where there is no physical evidence at all, however, the mere testimony of friends and interested parties is insufficient corroboration to support a fact finder's determination of invalidity. *Woodland Trust*, 148 F.3d at 1373. Corroboration is not necessary for every fact issue. *Ethicon, Inc.*, 135 F.3d at 1461.

### 2. Coinventorship

■ "A patented invention may be the work of two or more joint inventors." *Ethicon, Inc.*, 135 F.3d at 1460 (citing 35 U.S.C. § 116). As with derivation challenges, a party challenging a patent's validity for failure to name a co-inventor must prove contribution to the invention by clear and convincing evidence. *Id.* at 1461. Just as in derivation challenges,

"conception is the touchstone of inventorship." *Id.* at 1460. Thus, a purported co-inventor must show by clear and convincing evidence that he or she contributed to the conception of the invention. *Id.* at 1460. Proving conception in the co-inventorship context, however, is less difficult than proving conception in the derivation context. *Id.* ("[E]ach of the joint inventors need not 'make the same type or amount of contribution' to the invention. 35 U.S.C. § 116. Rather, each needs to perform only a part of the task which produces the invention."). Moreover, a purported co-inventor need not make a contribution to every claim of a patent; contribution to one claim is enough. *Id.*

> All that is required of a joint inventor is that he or she (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

*Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed.Cir.1998). As with derivation claims, corroborating evidence is required. *Ethicon, Inc.*, 135 F.3d at 1461.

### B. Analysis

#### 1. Prior Complete Conception

■ Defendant bases its claim that Mr. Berlivet had prior conception of the '859 patent on (1) Mr. Berlivet's alleged mockups using the X56–2 as a "mule" in the winter of 1976–77 and (2) the X56–5 machine. Mr. Berlivet testified that he directed mockups in the winter of 1976–77 that included a horizontally spaced pivoting gearbox and steering structure. He also testified that he directed the construction of the X56–5 machine to have these same features.

The court concludes that the defendant has failed to prove by clear and convincing

evidence that any of this work was a prior conception of the '859 patent. The defendant has not convinced the court by clear and convincing evidence that the mockups Mr. Berlivet allegedly directed in the winter of 1976–77 were a prior conception of the '859 patent, nor has defendant convinced the court by clear and convincing evidence that the X56–5 machine was a prior conception of the '859 patent. The evidence at trial simply left the court short of the requisite abiding conviction that Mr. Berlivet actually conceptualized a pivoting gearbox with steering structure. *See Colorado v. New Mexico,* 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984) (proof by clear and convincing evidence requires abiding conviction that the truth of a factual contention is highly probable).

### a. Lack of Contemporaneous Documents or Photographs

The court concludes that defendant has fallen short of the requisite standard of proof in part because of the utter void of any contemporaneous documents or photographs. There are no documents or photographs in evidence that shed light on whether the X56–5 utilized a horizontally spaced pivoting gearbox with steering structure. There are no documents or photographs in evidence that shed light on whether the winter '76/'77 mockups utilized a horizontally spaced pivoting gearbox with steering structure. Defendant must obtain a generous reading of ambiguous documents even to confirm that the mockups were actually made. The court believes the documentary evidence void is particularly telling in light of the ample contemporaneous documentation, including numerous photographs, showing the existence and the precise configuration of the PT–8D machine and the X56–1, –2, –3, and –4 machines.

The court simply is not persuaded that the documentary and photographic evidence defendant characterizes as corroborating the winter mockups is, in fact, corroborative. Defendant points the court's attention to a collection of contemporaneous photographs, introduced at trial as defendant's exhibit 581, which Mr. Berlivet characterizes as showing the X56–2 mower conditioner with patches of unpainted steel on the sides of the header. According to the defendant, the photographs corroborate Mr. Berlivet's testimony that he modified the X56–2 during the mockups to include side lift links attached to the header. Mr. Berlivet apparently removed the side lift links before the photographs. The court concludes that even if the unpainted steel patches corroborate Mr. Berlivet's contention that he made some modifications using the X56–2 machine as a mule, they shed no light on whether the mockups utilized a pivoting gearbox and steering structure. Again, given the wealth of documents and photographs showing the configurations of the X56–1, –2, –3, and –4 machines, the lack of any contemporaneous document or photograph showing the configuration of the mockups is telling.[16]

Contemporaneous documentary evidence related to the X56–5 machine, while confirming the existence of the machine, does nothing to explain the configuration of the X56–5. Instead, the evidence actually casts doubt on whether the machine was a center pivot machine with a pivoting gearbox or steering structure. Mr. Berlivet sent a memo to various engineering and management people on October 19, 1977. In the memo, he explained that Hesston management had decided to switch the X56 project to a side pull project rather than a center pull project. He also explained that certain modifications made to the drive

---

16. Although there was evidence that mockup work at Coex normally did not generate as much documentation as full-fledged prototype work, the court does not believe this evidence overcomes the complete documentary and photographic void as to the mockups. If Mr. Berlivet did, in fact, conceptualize a pivoting gearbox and steering structure on these mockups, the void is unfortunate. Nonetheless, the defendant bears the heavy burden of proof on this issue; thus the defendant must bear the risk that such an unfortunate outcome may come to pass.

line on the side pull machine "would permit to solve the problems we had in Scotland [including] u-joint transmission, more simple, and with wide angle u-joints would cancelled [sic] the vibrations known on the center pivot machine." Mr. Gaignard, a member of the Hesston, S.A. management team in the mid–1970s, testified that he clearly remembered sending the X56–5 machine by air freight to the United States for testing. Sending a machine by air was expensive and was not the normal means of sending machines overseas. Mr. Gaignard was fairly certain the machine was air freighted in November, 1977. Given the company's decision no later than mid-October to switch to side pull from center pivot, the court finds it unlikely that the company would have incurred the expense of shipping a center pivot machine to the United States by air freight in November. Moreover, Mr. Berlivet testified that the machine tested in Scotland, the X56–5 machine, had a pivoting gearbox. The memo's reference to U-joint transmission problems in Scotland seems to weigh against any inference that Mr. Berlivet is correct on this point because if the X56–5 utilized a pivoting gearbox with steering structure concept as described in the '859 patent, drive line problems likely would not have been as large a concern.

### b. Unclear Memories

Also contributing to the court's conclusion that the defendant has fallen short of its burden is the unclear and sometimes confused testimony of the witnesses brought in to corroborate Mr. Berlivet's story. For example, Mr. Gaignard was unclear in his recollection of the X56 project. Although he testified that he remembered doing cost evaluations on the mock-up work, he was not entirely clear about the precise configuration of the various machines. He also testified that he could not recall the differences between the X56–1, –2, –3, –4, and –5 machines. Mr.

Peltan, who was Mr. Berlivet's boss during the winter of '76/'77, testified that he did not really recall the details of the mockup work. Abel Guerineau, who was involved in testing machines in the X56 project, had no clear memory of the details behind any of the machines. It was evident to the court that the witnesses from whom the defendant sought corroborating testimony generally relied heavily on Mr. Berlivet's memory for details.

The following colloquy was characteristic of Mr. Gaignard's testimony concerning the X56–5, as well as the testimony of the other witnesses associated with Mr. Berlivet's work in Coex:[17]

> THE COURT: All right. Mr. Gaignard, what do you understand the word "pivoting" to mean? Describe to me what you mean by the word "pivoting."
>
> MR. GAIGNARD: Pivoting with the—with the tongue in—in the machine, like PT8D, you know. But I know the function, but I don't know the workings.

(Doc. 226, at 2057). The colloquy raises serious doubts in the court's mind about the X56–5 design because the gearbox on the PT–8D was mounted inside the tongue so that the tongue and the gearbox pivot axes were aligned. The PT–8D did not have a horizontally spaced gearbox nor did it have steering structure.

### c. Rule of Reason

Rule of reason analysis also leads the court toward a conclusion that defendant has failed to meet its burden. The first factor to consider in the rule of reason analysis is the relationship between the inventor and the corroborating witnesses. On balance, the court believes this factor weighs in favor of no prior conception. The relationship between Mr. Berlivet and Messrs. Gaignard, Peltan, Guerineau, and Claude Richard[18] was one of professional

---

17. Although Mr. Gaignard, a management employee, perhaps would not be expected to remember as much detail about each machine, his testimony reflects the general feel the court had from the corroborating wit-

nesses that none of them clearly remembered the details of Mr. Berlivet's work.

18. Mr. Richard was involved in testing the X56–3 machine in South Africa.

respect, and the testimony of all of these witnesses appeared to have been influenced by Mr. Berlivet's view of the facts.

The second factor to consider is the delay between the inventor's alleged conception and the trial. The court believes this factor weighs in favor of no prior conception. Over twenty years elapsed between Mr. Berlivet's alleged prior conception and the trial. Although the court recognizes that the memories of the witnesses were perhaps as good as could be expected after such a time, the court also recognizes that the defendant, bearing the heavy burden of proof, must also bear the risk that its witnesses simply could not remember after such time.

The third factor to consider is the interest of the corroborating witnesses in the subject matter in suit. The court believes this factor is neutral. On the one hand, there is no real evidence that any of the corroborating witnesses have any financial stake in the outcome of this litigation. On the other hand, all of these witnesses have current or former ties to the defendant. Moreover, the fact they all voluntarily traveled overseas at the defendant's expense to appear at trial gives the court a certain impression, fairly or not, that they saw themselves as being on the defendant's "team," rather than as wholly disinterested bystanders relating recollections of times gone by.

The fourth factor to consider is contradiction or impeachment of testimony. The court believes this factor weighs in favor of no prior conception. As explained above, Mr. Berlivet's October 19, 1977 memo seems to contradict his testimony and the testimony of others that the X56–5 had a

pivoting gearbox and steering structure. Moreover, Mr. Berlivet's story changed between his first declaration, his second declaration, and his deposition in this case.[19] There were also some inconsistencies between the stories of the various witnesses. Although the inconsistencies do not play a large role in the court's decision given the lapse of time and faded memories, they are inconsistencies nonetheless. Given defendant's heavy burden of proof, defendant cannot benefit from faded memories.

The fifth factor to consider is the extent and details of the corroborating testimony. The court believes this factor weighs heavily in favor of no prior conception. As the court has already explained, there is no contemporaneous documentary or photographic evidence concerning the precise construction of the mockups or the X56–5. Moreover, the oral testimony of Messrs. Peltan, Gaignard, Guerineau, and Richard exposed their lack of memory of details and their apparent reliance on Mr. Berlivet.

The sixth factor to consider is the witnesses' familiarity with the subject matter of the patented invention and the prior conception. The court expresses no opinion on this factor because the parties offered no evidence of the corroborating witnesses' knowledge of the '859 patent. The court has no doubt, however, that the corroborating witnesses would have had extensive knowledge of whatever work Mr. Berlivet was doing in the mid–1970s.

The seventh factor to consider is the probability that a prior conception could occur considering the state of the art at the time. The court believes this factor

19. Defendant apparently argues that Mr. Berlivet's changing story should not cut against prior conception because the changes were merely a result of Mr. Berlivet's ability to refresh and sharpen his memory by looking at contemporaneous documents. At the time of Mr. Berlivet's first declaration, he was working from cold memory. At the time of his second declaration, he had located some documents in Coex. The plaintiffs either had not produced or were unwilling to allow him to

see their production of contemporaneous documents related to the work in Coex. At the time of Mr. Berlivet's deposition, Mr. Berlivet had seen the plaintiffs' documents. Although not a major factor in the court's decision, the court believes the story changes could just as easily be an ex post facto attempt to conform a hazy story to inferences found in documents as they are a reflection of Mr. Berlivet's refreshed memory.

cuts in favor of prior conception because there is no reason to believe a prior conception could not have occurred during the mid–1970s.

The final factor to consider is the impact of the invention on the industry and the commercial value of its practice. The court believes this factor weighs against prior conception because the '859 patent had a profound effect on the industry and has great commercial value. In contrast, the alleged prior conception had no effect on the industry and no commercial value because it was scrapped.

On balance, rule of reason analysis leads the court to conclude that Mr. Berlivet did not have a prior conception. Five of the above factors weigh against prior conception, two are neutral, and only one weighs in favor of prior conception. The most crucial factor in the court's mind is the complete void of contemporaneous documentation and photographs showing the configuration of the mockups or the X56–5. The void looms large given the wealth of contemporaneous documentation and photographs concerning the other X56 prototypes. Of course, other evidence was offered in this case to support Mr. Berlivet's version of events. The court is unable in these findings, however, to address every scintilla in the mountainous evidence the parties have submitted on this issue. Suffice it to say, the court has carefully considered all the evidence and simply believes that, on balance, there are too many missing links and inconsistencies in Mr. Berlivet's story to overcome the defendant's heavy burden of proof.[20]

### 2. Contribution to Conception

Defendant argues that the ideas Mr. Berlivet used in the PT–8D and the X56–1 through –4 machines constitute a contribution to the conception of the '859 patent. Specifically, defendant contends that Mr. Berlivet contributed the pivoting gearbox concept from the PT–8D, the drive line supported beneath the tongue concept from the X56–2, and the horizontally spaced gearbox on the header concept from the X56–4 to the conception of the '859 patent. There is no dispute that Mr. Pruitt, Mr. Case, and Mr. Garrison, the named inventors in the '859 patent, were well aware of the details of Mr. Berlivet's work on the PT–8D and the X56–1 through –4. There also is no dispute that these machines had the features claimed.

■ The court concludes that Mr. Berlivet is not a coinventor of the '859 patent because he did not contribute anything of significant quality to the named inventors. *See Pannu,* 155 F.3d at 1351 ("All that is required of a joint inventor is that he or she ... (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention...."). The value of the '859 patent comes from its *combination* of a pivoting gearbox, a drive line supported beneath the tongue, horizontally spaced pivot axes, and other important elements in a specific configuration. Even if Mr. Berlivet had the idea to use certain of these elements independently, his contribution was insignificant because he did not in any way contribute to the conception of the combination.

■ The court also concludes that Mr. Berlivet is not a coinventor of the '859 patent because he, in effect, did not do anything more than merely explain the current state of the art. *See Pannu,* 155 F.3d at 1351 ("All that is required of a joint inventor is that he or she ... (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art."). By the time

---

**20.** Even if the court were to find that Mr. Berlivet developed a complete prior conception of the '859 patent, the court concludes that the defendant has not proven by clear and convincing evidence that Mr. Berlivet communicated the conception to one or more of the named inventors. Mr. Case, Mr. Pruitt, and Mr. Garrison all testified that they neither heard of nor saw a horizontally spaced pivoting gearbox on a Coex machine. The court found this testimony credible. The only specific evidence to the contrary is the testimony of Mr. Berlivet, which is wholly uncorroborated.

Messrs. Case, Garrison, and Pruitt applied for the '859 patent in April of 1991, all of Mr. Berlivet's purported contributions had been disclosed in the prior art for at least a year and a half. The '418 patent, which issued on August 22, 1989, discloses a pivoting gearbox, a drive line supported underneath the tongue, and a horizontally spaced gearbox on a header. Accordingly, any contribution Mr. Berlivet made of these concepts was insignificant by that time. Moreover, the '418 patent discloses these three concepts in a single machine, whereas Mr. Berlivet's purported contributions were in three separate machines. Although the record is unclear concerning whether Mr. Berlivet's purported contributions did more than merely explain the prior art in the mid–1970s when he made them, they did a good deal less than merely explaining the state of the art at the time Messrs. Pruitt, Case, and Garrison applied for the '859 patent. Defendant has failed to meet its burden to show by clear and convincing evidence that Mr. Berlivet is a coinventor of the '859 patent.[21]

## VII. Invalidity Pursuant to 35 U.S.C. § 103

Defendant argues that claims 1, 2, 8, 9, 10, and 11 of the '859 patent are invalid because they would have been obvious to a person of ordinary skill in light of the pertinent prior art. The court concludes that claims 1, 2, 8, and 9 are invalid for obviousness but that claims 10 and 11 are not invalid for obviousness.

### A. Legal Framework

 A patent claim is invalid for obviousness "if the differences between the claimed invention as a whole and the prior art 'are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art.' 35 U.S.C. § 103." *Litton Sys., Inc. v. Honeywell, Inc.*, 87 F.3d 1559, 1566 (Fed.Cir.1996), *vacated on other grounds*, 520 U.S. 1111, 117 S.Ct. 1240, 137 L.Ed.2d 323 (1997), *reinstated as to obviousness*, 140 F.3d 1449, 1453 (Fed.Cir.1998). Obviousness is a legal conclusion based on underlying facts. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 545 (Fed.Cir.1998). Four types of facts must be considered by the trier of fact: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness." *Id.* (citing *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)).

Resolving obviousness issues involves "a difficult process of turning back the clock to a time when the invention was made and asking what one of ordinary skill in the art might have thought." *Litton Sys., Inc.*, 87 F.3d at 1566.

Determination of obviousness can not [sic] be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the claimed invention. There must be a teaching or suggestion within the prior art, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular sources of information, to select particular elements, and to combine them in the way they were combined by the inventor.

21. If Mr. Berlivet did, in fact, contribute to the conception of the '859 patent as a coinventor, the court concludes that Mr. Berlivet's rights in the patent are now owned by New Holland Braud, S.A., a sister company to the defendant. The testimony of Richard Hrdlicka and Roberto Miotto convinced the court that whatever unpatented rights Mr. Berlivet may have had in the X56 and PT–8D projects were retained by his employer at the time, Hesston S.A., pursuant to French law and pursuant to Hesston S.A.'s practice at the time. Mr. Hrdlicka and Mr. Miotto explained that, through a series of transactions, the corporate successor to Hesston S.A. and the owner of all its assets is New Holland Braud, S.A. Neither Mr. Berlivet nor New Holland Braud S.A. consent to this lawsuit.

*ATD Corp.,* 159 F.3d at 546 (citation omitted). The Federal Circuit has explained the difficulty of this inquiry as follows:

The question of nonobviousness is a simple one to ask, but difficult to answer. The person of ordinary skill in the art at the time of the patentee's invention, ... is presumed to have before him all of the relevant prior art. [Often,] the available art shows each of the elements of the claims in suit. Armed with this information, would it then be nonobvious to this person of ordinary skill in the art to coordinate these elements in the same manner as the claims in suit? The difficulty which attaches to all honest attempts to answer this question can be attributed to the strong temptation to rely on hindsight when undertaking this evaluation. It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness in a court of law.

*Orthopedic Equipment Co. v. United States,* 702 F.2d 1005, 1012 (Fed.Cir.1983), *quoted in* Kenneth R. Adamo, *The Power of Suggestion (Teaching, Reason or Motivation) and Combined–Reference Obviousness,* 76 J. Pat. & Trademark Off. Soc'y 177, 191 (1994). The court's inquiry must consider portions of references which "teach away" from the claimed invention. *Monarch Knitting Machinery Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 885 (Fed.Cir.1998). A reference that teaches away from the claimed invention would discourage a person of ordinary skill in the art from following the particular path chosen by the inventors. *Id.*

██ The introduction of prior art during litigation which was not before the patent examiner during prosecution of the patent in suit may facilitate the challenger's task of proving invalidity. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1375 (Fed.Cir.1986). The presentation of evidence not before the examiner, however, does not change the pre-sumption of validity; such evidence merely may make the burden to prove invalidity easier to carry. *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.,* 98 F.3d 1563, 1569 (Fed.Cir.1996).

### B. Claims 10 and 11 Not Invalid for Obviousness

██ The court concludes that claims 10 and 11 of the '859 patent would not have been obvious to a person of ordinary skill in the art. Nothing in the prior art would have suggested the combinations disclosed in these claims to an artisan of ordinary skill. The invention benefits from a synergy that was not predictable from the prior art. In fact, the prior art taught away from the claimed invention to some extent. The invention enjoyed considerable commercial success. All of these considerations, and others, contribute to the court's conclusion.

#### 1. Scope and Content of Prior Art

The court concludes that all of the references listed *supra* in part I.E. are within the content of the prior art. Plaintiffs conceded during closing argument that all of defendant's cited references fall within the scope of the relevant prior art. Thus, the parties essentially agree that the scope of the relevant prior art includes agricultural equipment, including hay harvester machines such as mower conditioners, mowers, forage harvesters, and hay handling machines such as round balers, square balers, rakes, tedders, etc.

Although the court has carefully considered all of the prior art references, the court concludes that the most pertinent prior art in the context of claims 10 and 11 includes the '418 patent, the Deere patents, and the New Holland forage harvesters. *See Richardson–Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1480 (Fed.Cir.1997) (identifying most relevant prior art after concluding that parties had no dispute about scope and content of prior art). The primary reference in the obviousness inquiry must be the '418 patent. Plaintiffs concede that the '418 patent embodies each

and every element of claims 1, 2, 8, and 9 of the '859 patent except for the steering structure limitation of claim 1. The Deere patents, as secondary references, disclose the concept of placing a bend axis at a point equidistant between the opposite U-joints of a telescoping drive line to maintain equal U-joint angles. As is apparent from the face of the Deere patents and from the unwavering testimony of all the expert witnesses in this case, the problem of equalizing U-joint angles has long been understood to be important in the art of agricultural engineering. In lay terms, when U-joint angles at opposite ends of a rotating drive line are unequal and a constant rate of power is delivered to the input end of the rotating drive line, a fluctuating rate of power results at the output end of the rotating drive line. If the rate of power output varies too greatly, severe damage can result to the drive line. The New Holland forage harvesters, as secondary references, disclose a telescoping deflector guide with a pivotal attachment to the tongue for causing a spout to swing responsively as the tongue pulls a wagon trailer around corners. The telescoping deflector guide has a pivotal attachment to the tongue and a horizontal pivot attachment to the pivoting spout.

## 2. Level of Ordinary Skill in the Art

The parties essentially agree that a person of ordinary skill in the art in the late 1980s and early 1990s would have been a product engineer or designer working for an agricultural machinery company. The person would have had at least an undergraduate degree in either mechanical or agricultural engineering, and would have had at least several years of experience.

## 3. Differences Between the Claimed Invention and the Prior Art

The court concludes that there are many differences between the prior art and claims 10 and 11. Again, in the '859 patent, claim 10 is dependent upon claims 1, 8, and 9, and claim 11 is dependent upon claim 10. Although the '418 patent discloses the entirety of claims 1, 8, and 9 except for the steering structure limitation of claim 1, the '418 patent discloses no part of claims 10 and 11 that is not dependent upon claims 1, 8, and 9. That is, not only does the '418 reference lack a steering structure connected between the tongue and the gearbox, it also lacks the specific elements of the steering structure required by claims 10 and 11: a telescoping linkage having a front pivotal connection with the tongue at a point at least approximately equidistant, and a rear connection with the junction box that includes horizontal pivot means.

As often appears to happen in obviousness cases, the elements missing from the primary reference can essentially be found elsewhere in the prior art. *See, e.g., Orthopedic Equipment*, 702 F.2d at 1012. The forage harvesters disclose telescoping linkage that has a pivotal connection with the tongue and a connection with the junction box that includes horizontal pivot means. The Deere patents disclose the idea of placing a bend axis equidistant from opposite ends of the telescoping drive line in order to equalize U-joint angles. According to the defendant, the court should find that a person of ordinary skill in the art would have thought it obvious to combine these references in the following way:

FIG. 2

'418 PATENT

1950s MODEL 601-611
FORAGE HARVESTERS

SUBSTITUTE KNOWN TELESCOPING
LINKAGE WITH PIVOTAL CONNECTIONS

FIG. 2

PLACE FRONT PIVOTAL
CONNECTION AT MIDPOINT
OF TELESCOPING DRIVELINE

COMBINED PRIOR ART TEACHING

The court concludes, however, that the Deere patents are not as similar to the equidistant limitation in claim 10 as defendant would perhaps like them to be. Defendant characterizes the Deere patents as teaching the concept of placing a pivot point at the midpoint of the drive line in order to equalize U-joint angles. Although the Deere patents teach the long known desirability of equal U-joint angles and specifically teach the ability to equalize U-joint angles in a system with a single bend point, they contain nothing to suggest to a person of ordinary skill in the art how equal U-joint angles might be obtained on prior art center pivot disc mower conditioners such as the '418 patent. Simply put, the defendant has failed to show a suggestion or motivation in the prior art that would make attaching a pivotal, telescoping steering structure between tongue and gearbox at a point approximately equidistant from the opposite ends of a telescoping drive line obvious to an artisan of ordinary skill. Combining the prior art references to find obviousness in the way suggested by the defendant would require the court to use the [20]/[20] hindsight provided

by the patent itself. *See Orthopedic Equipment Co.*, 702 F.2d at 1012. This the court must not do. *See Monarch Knitting Machinery*, 139 F.3d at 882.

In fact, the prior art teaches away from the patented combination to some extent. The '418 patent teaches that the proper way to minimize drive line troubles is by using the forked support joint. The forked support joint keeps the U-joint closest to the gearbox in line with the intake shaft of the gearbox; that is, the '418 patent teaches a zero degree angle at the fourth U-joint. The '418 teaches away from the claimed combination because in order to get claims 10 and 11 from the '859 patent to work properly on the '418 patent, the forked support joint on the '418 patent would need to be completely removed so that the fourth U-joint could move freely at an angle equalized with the third U-joint. These equal angles are what substantially stabilize the rotational force being transferred through the drive line.

### 4. Objective Considerations

#### a. Praise in the Industry

The plaintiffs' evidence strongly indicates that the '859 patent received great praise in the industry. *See, e.g., Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1546 (Fed.Cir.1984) (recognizing praise in the industry, in particular from an alleged infringer, as important objective evidence of nonobviousness). The defendant's documents heap praise on the plaintiffs' commercial embodiments. On November 5, 1993, defendant generated a document indicating that "[p]erformance of the [Case] 8312 was quite impressive. The driveline ran very smoothly and quietly. . . . The features, operation and simple design of the 8312 will make this disc mower conditioner very appealing." In the defendant's attempts to design a center pivot mower conditioner before it became aware of the '859 patent, the defendant created a prototype center pivot machine that essentially copied claims 10 and 11. Although the defendant later altered its design, the court believes the initial copying is substantial evidence that the defendant thought highly of the invention.

#### b. Commercial Success

The plaintiffs argue that their commercial embodiments of the '859 patent achieved great commercial success. Commercial success is an important objective indicator of nonobviousness. *See, e.g., Pro–Mold and Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1572 (Fed.Cir. 1996). A patentee asserting commercial success must establish a nexus between the claimed invention and the commercial success:

> for commercial success of a product embodying a claimed invention to have true relevance to the issue of nonobviousness, that success must be shown to have in some way been due to the nature of the claimed invention, as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter. Thus, a "nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight enroute to [a] conclusion on the obviousness issue."

*Cable Electric Prods. v. Genmark, Inc.*, 770 F.2d 1015, 1027 (Fed.Cir.1985) (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed.Cir.1983)).

Once the patentee establishes a prima facie showing of nexus, the burden shifts to the challenger to show that the success is due to factors other than the nature of the invention. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392–95 (Fed.Cir.1988). A patentee can make out a prima facie case of nexus by showing that there was commercial success and showing that the invention disclosed and claimed in the patent is what was commercially successful. *Id.*

The court concludes that the plaintiffs have offered a strong showing of commercial success and a prima facie showing of nexus. The plaintiffs' machines are un-

questionably commercial embodiments of the patent. The plaintiffs went from a very small market share in the mower conditioner market before introduction of their commercial embodiments to an approximately fifty percent market share in only four years.

### c. Long-felt Need

The plaintiffs argue that the '859 patent was a solution to a long-felt but unsolved need. The failure of others to provide a feasible solution to a long-standing problem is relevant to the obviousness inquiry. *Intel Corp. v. United States ITC*, 946 F.2d 821, 835 (Fed.Cir.1991). "Such evidence shows indirectly the presence of a significant defect [in the prior art], while serving as a simulated laboratory test of the obviousness of the solution to a skilled artisan." Note, *Subtests of "Nonobviousness": A Nontechnical Approach to Patent Validity*, 112 U.Pa.L.Rev. 1169, 1173 (1964).

The court concludes that the evidence of a long-felt need for the '859 patent weighs in favor of a finding of nonobviousness as to claims 10 and 11. The prior art clearly showed efforts by various companies to develop commercially successful center pivot mechanical drive disc mower conditioners, but none were able to. The Kuhn patent and its commercial embodiment, the Kuhn Alterna 500, for example, disclosed a center pivot disc mower conditioner with mechanical drive, but the machine was not commercially successful in the United States. A machine manufactured by a European company named Vicon also falls into this category. The Niemeyer machine does, too. Mr. Berlivet sought a commercially viable center pivot machine with mechanical drive as long ago as the late 1970s. None of these efforts were successful.

### d. Synergy

Although the plaintiffs did not specifically argue that the '859 patent enjoys synergy, the concept was a noticeable theme at trial. It has long been established that synergy may support a finding of nonobviousness. *See, e.g., Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 717 (Fed.Cir. 1991).

The court concludes that the combinations disclosed in claims 10 and 11 of the '859 patent enjoy a kind of synergy; that is, the court believes the combinations produce more than the sum of their parts. By placing a telescoping steering structure at the approximate midpoint on the tongue between the opposite ends of the telescoping drive line, the patent achieves not only a simple way to steer the gearbox, but also achieves "substantially equal angles ... at opposite ends of the drive line regardless of the swing angle of the tongue...." '859 patent, col. 2, lines 30–33.

### e. Independent Development

The defendant argues that the '859 patent is obvious because Ken McLean independently invented the same concept. "Contemporaneous independent development of the invention by another inventor strongly suggests that the invention of the patent was obvious." Timothy R. DeWitt, *Use of Objective Evidence of Non–Obviousness in the Federal Courts*, 79 J. Pat. & Trademark Off. Soc'y 823, 839 (1997) (citing *In re Merck & Co.*, 800 F.2d 1091, 1098 (Fed.Cir.1986)).

The court concludes that there is no evidence that Mr. McLean independently developed claims 10 and 11. Although Mr. McLean's work at New Holland in 1987 was quite similar to the invention disclosed in these claims, there are important differences. Unlike claim 10, Mr. McLean's work does not show a steering structure that is equidistant from the opposite ends of the drive line. Rather, Mr. McLean's steering structure is located on the tongue almost entirely to one side of the telescoping drive line. Unlike claim 10, Mr. McLean's disclosure does not appear to contemplate equal U-joint angles. Instead, it is like the '418 patent because it contemplates "an essentially 0˜joint angle at the fourth [U-]joint." It does not speak to the angularity of the third U-joint at all.

### 5. Summary

In sum, the court concludes that claims 10 and 11 are not invalid for obviousness. There is simply no suggestion, motivation, or teaching from the prior art that would cause an artisan of ordinary skill to attach a pivotal, telescoping steering structure between tongue and gearbox at a pivot point approximately equidistant from the opposite ends of a telescoping drive line in order to provide a smooth running drive line. The prior art, in fact, teaches away from such a combination to some extent. The claimed combination enjoys synergy, considerable commercial success, was a solution to a long-felt but unsolved problem, and has received praise from others in the industry.

### C. Claims 1, 2, 8, and 9 Invalid for Obviousness

The court concludes that claims 1, 2, 8, and 9 of the '859 patent are invalid for obviousness. Unlike claims 10 and 11, the prior art amply would have suggested and motivated the combinations disclosed in claims 1, 2, 8, and 9 to an artisan of ordinary skill. Moreover, the only concept in these claims serving to distinguish them from the prior art at all, the steering structure, was independently invented by Ken McLean at New Holland. Mr. McLean's invention was sufficiently similar to claim 1 to provide weighty objective evidence that the claimed combination was obvious. Although the commercial embodiment of the '859 patent enjoyed commercial success, the court gives the success little weight because the defendant has shown that claims 1, 2, 8, and 9 of the patent contributed far less to its success than claims 10 and 11.

### 1. Scope and Content of Prior Art

There is again no dispute over the scope and content of the prior art. All of the references listed *supra* in part I.E. are within the content of the prior art.

Although the court has carefully considered all of the prior art references, the court concludes that the most pertinent prior art in the context of claims 1, 2, 8, and 9 includes the '418 patent, the Australian patent, the Dutch patent, the Eberly and Dickensheid patents, and the New Holland forage harvesters. The primary reference in the obviousness inquiry must once again be the '418 patent. Plaintiffs concede that the '418 patent embodies each and every element of claims 1, 2, 8, and 9 of the '859 patent except for the steering structure limitation of claim 1. The Australian patent, a secondary reference, discloses the concept of using a torque arm to effect steering of a pivoting gearbox. The Dutch patent, also a secondary reference, also discloses the concept of using a torque arm or steering structure to effect steering of a pivoting gearbox. The Eberly and Dickensheid patents, along with the New Holland forage harvesters, are secondary references which disclose a steering structure connected between a tongue and a pivoting spout for causing the spout to pivot in response to the swinging of the tongue.

### 2. Level of Ordinary Skill in the Art

The level of ordinary skill in the art is the same for claims 1, 2, 8, and 9 as it was for claims 10 and 11.

### 3. Differences Between the Claimed Invention and the Prior Art

There are only minor differences between the prior art and the claimed invention. Plaintiffs concede that the '418 patent discloses each and every element of independent claim 1 and dependent claims 2, 8, and 9 except the steering structure element of claim 1. Thus, the '418 patent is identical to these claims of the '859 patent except that the '418 patent lacks "steering structure connected between the junction box and the tongue for causing the junction box to swing responsively about [the gearbox pivot] axis with the tongue when the [tongue] is pivoted about [its] axis between its various angular positions."

It is important at this point to be precise about what the steering structure limitation of claim 1 does and does not claim. The court construed the steering structure limitation to require a steering structure

separate from the drive line that operatively interacts with the tongue at one end and operatively interacts with the junction box at the other end and that transmits the swinging motion of the tongue to the junction box during swinging of the tongue. The steering structure "has the effect of steering the gearbox as the tongue is swung such that loading is relieved from the drive line." '859 patent, col. 2, lines 24–27. What the steering structure limitation of claim 1 does *not* do, except in the special case identified by claims 10 and 11 where the steering structure is placed at a point approximately equidistant from the opposite ends of the drive line, is equalize the U-joint angles in the drive line. The very next sentence of the specification illustrates this point:

> The anchor point of the steering linkage to the tongue is approximately equidistantly spaced from opposite ends of the telescoping section of the drive line *so that* substantially equal angles are presented at opposite ends of the drive line regardless of the swing angle of the tongue, hence reducing the torsional loading otherwise experienced by the drive line at the opposite ends of the telescoping section due to unequal angular relationships at those locations.

'859 patent, col. 2., lines 27–36 (emphasis added). Put another way, the steering structure claimed in claim 1 merely steers the gearbox and relieves ordinary operation loading from the drive line. The steering structure claimed in claims 10 and 11 does much more; it substantially equalizes the U-joint angles in the drive line to

reduce the torsional loading experienced when the angles are not equal.[22]

Accordingly, the court need not inquire whether the prior art would have suggested claim 10's solution to the problem of unequal U-joints to a person of ordinary skill in the art. Instead, the court must inquire whether the prior art would have suggested claim 1's solution to the problem of how to resist normal torque on a pivoting gearbox from operating components without creating stress on the drive line. U-joint angle considerations are not pertinent to the problem solved in claim 1.

In defining the problem in this way, the court does not believe it has used hindsight. The problem so defined would have been recognized by a person of ordinary skill in the art even without the benefit of the '859 patent. As the court explains below, a person of ordinary skill in the art would have had the '418 patent at the forefront of his or her mind, and would have recognized that the '418 patent suffered from the very problem claim 1 of the '859 patent sought to solve.

A person of ordinary skill in the art faced with the broad problem articulated by the '859 patent would have had the '418 patent at the forefront of his or her mind. The broad, ultimate objective behind the '859 patent as stated by the inventors was to develop a center pivot disc mower conditioner with a mechanical drive that was able to withstand the twists, turns, and angular motions effected by the harvester as it was used in its most efficient manner.[23] A person of ordinary skill in the art would have understood that the

22. The abstract of the '859 patent also illustrates this distinction:

> Telescoping steering linkage between the swing tongue and the gearbox causes the box to swing responsively with the tongue when the tongue is swung to any of its angular positions, thus keeping the input shaft of the gearbox oriented properly toward the drive line along the tongue. *The connection points for the steering linkage between the tongue and the gearbox are such that a telescoping section of the driveline bridging the tongue and the input shaft of the gearbox has equal angles maintained at its universal joints . . . .*

'859 patent abstract (emphasis added). The first sentence, apparently referring to claim 1, says nothing about equal U-joint angles. The second sentence, obviously referring to claims 10 and 11, describes how proper placement of the steering linkage effects equal U-joint angles.

23. [I]t would . . . be desirable, if possible, to have a mechanical drive line between the tractor and the harvester which could supply all of the power needs of the harvester and yet fully withstand the twists and turns and angular motions effected by the harvester as it is

prior art had already achieved the stated objective to some extent because the Kuhn patent and the Niemeyer machine both partially solved the problem. The artisan would have also understood, however, that machines like the Kuhn Alterna 500 and the Niemeyer machine had difficulty with their cutting components on uneven fields. The machines suffered from what the prior art termed "floatation problem." A person of ordinary skill in the art would have recognized that the '418 patent enjoyed better floatation[24] than the Kuhn patent or the Niemeyer machine because the '418 patent discloses a gearbox pivot axis horizontally spaced from its tongue pivot axis, which allows for a better floating header. The Kuhn patent and the Niemeyer machine do not float well because they basically have aligned pivot axes. Thus, the hypothetical person of ordinary skill in the art looking to improve on the floatation problems of the Kuhn patent and the Niemeyer machine would have had the '418 patent at the forefront of his or her mind.

A person of ordinary skill in the art looking at the '418 patent would have understood that the '418 method of using the drive line to resist torque from the operat-ing components subjects the drive line and bearings to harmful loads. Such a person would have been motivated to look for a way to reduce the loading on the drive line. This is precisely the motivation behind the steering structure in claim 1 of the '859 patent.

The steering structure element missing from the '418 patent can readily be found elsewhere in the prior art. The Australian patent, for example, discloses a torque arm or steering structure connected to a pivoting gearbox to resist torque coming from the operating components. The Dutch patent similarly discloses a steering structure that tends to resist torque on a pivoting gearbox. The Eberly and Dickensheid patents and the New Holland forage harvesters, although less pertinent than the Australian and Dutch patents because they do not deal with gearboxes, disclose a steering arm connected to a tongue for causing a pivoting member to pivot responsively as the tongue moves relatively.

According to the defendant, the court should find that a combination such as the one shown in the following figure would have been obvious to a person of ordinary skill in the art facing the problem identified by the court:

used and maneuvered in its most efficient manner." '859 patent, col. 1, lines. 56–61.

24. The '418 patent itself identifies this concept: "It is a further object of this invention to provide a mower ... which is particularly well adapted to mow fields with uneven ground surfaces." '418 patent, col. 2, lines 6–9.

FIG. 2

'418 PATENT

SUBSTITUTE KNOWN STEERING STRUCTURE 33

FIG. 2

COMBINED PRIOR ART TEACHING

The court generally agrees with the defendant and finds that the Australian patent, read in conjunction with the other cited prior art, likely would have suggested the above combination to a person of ordinary skill in the art. The text of the Australian patent directly addresses the shortcomings of the '418 patent. That is, the text of the Australian patent would suggest to an ordinary artisan the claimed solution to the problem of how to resist normal torque on a pivoting gearbox from operating components without creating stress on the drive line. The Australian patent uses the torque arm "to overcome the torque upon the [gearbox] housing 17 caused through the resistance of the pinion 21 to be driven...." Australian patent, col. 4, lines 1–3. The torque arm allows "any torque in the housing 17 tending to revolve it about the shaft 14 [to be] amply counteracted...." Australian patent, col. 4, lines 11–13. The Dutch patent, which teaches concepts similar to the Australian patent, and the Eberly patents, the Dickensheid patent, and the New Holland forage harvesters, which fur-

ther teach an ordinary artisan how to effect steering action between a tongue and a pivotal member, all underscore the court's conclusion.

The plaintiffs, of course, argue against this result. According to the plaintiffs, the prior art would not have suggested the claimed combination because the Australian torque rod is not used to cause one pivotal component on the same machine, i.e. the tongue, to steer another pivotal component on the same machine, i.e. the gearbox, in such a manner that a telescoping drive line between the tongue and the gearbox is manipulated into the desired angular relationship.

Although the plaintiffs' argument misses the mark, it raises a good point. To the extent the plaintiffs' argument relies on the angular relationships necessary to cancel vibrations caused by unequal U-joint angles, it misses the mark because it is relevant only to the obviousness inquiry on claims 10 and 11—not claims 1, 2, 8, and 9. To the extent, however, that the plaintiffs' argument can be construed to argue that the Australian patent (and other prior art) would not suggest placing a torque arm between a pivoting tongue and a pivoting gearbox to cause the pivoting tongue to steer the pivoting gearbox, the plaintiffs raise a good point. There is no explicit teaching or suggestion in the prior art to make the precise combination claimed in claim 1, where there is so much relative motion between the components attached to the torque arm.

The court concludes that the prior art's failure explicitly to suggest the use of a torque arm in this context, however, is not fatal to the defendant's position. The court believes an artisan of ordinary skill would have thought it obvious to make the necessary jump in light of the explicit language in the Australian patent addressing the precise conceptual problem the artisan would have recognized in the '418 patent.[25] Chief Judge Nies' explanation of the sug-

gestion or motivation requirement of obviousness supports the court's conclusion:

I agree with the panel decision and write only to express my understanding of the language that there must be some teaching, reason, suggestion, or motivation found "in the prior art" or "in the prior art references" to make a combination to render an invention obvious within the meaning of 35 U.S.C. § 103 (1988). Similar language appears in a number of opinions . . . and if taken literally would mean that an invention cannot be held to have been obvious unless something specific in a prior art reference would lead an inventor to combine the teachings therein with another piece of prior art.

This restrictive understanding of the concept of obviousness is clearly wrong. Other statements in opinions express the idea more generally. We have stated, for example, that the test is: "whether the teachings of the prior art, taken as a whole, would have made obvious the claimed invention," . . . and "what the combined teachings . . . would have suggested to one of ordinary skill in the art[.]" . . . We have also stated that "the prior art as a whole must suggest the desirability . . . of making the combination." . . .

I believe that it would better reflect the concept of obviousness to speak in terms of "*from* the prior art" rather than simply "*in* the prior art." The word "from" expresses the idea of the statute that we must look at the obviousness issue through the eyes of one of ordinary skill in the art and what one would be presumed to know with that background. What would be obvious to one of skill in the art is a different question from what would be obvious to a layman. An artisan is likely to extract more than a layman from reading a reference.

---

**25.** The court is guided heavily in this conclusion by its consideration of objective indicia

of obviousness, as explained below.

... While there must be some teaching, reason, suggestion or motivation to combine existing elements to produce the claimed device, it is not necessary that the cited references or prior art specifically suggest making the combination.... Such suggestion or motivation to combine prior art teachings can derive solely from the existence of a teaching, which one of ordinary skill in the art would be presumed to know, and the use of that teaching to solve the same or similar problem which it addresses....

In sum, it is off the mark for litigants to argue, as many do, that an invention cannot be held to have been obvious unless a suggestion to combine prior art teachings is found *in* a specific reference.

*In re Oetiker,* 977 F.2d 1443, 1447–48 (Fed.Cir.1992) (Nies, C.J., concurring). The situation here is a more powerful case for obviousness than the one Judge Nies posited because here there is an explicit conceptual teaching for how the '418 patent's torque problems might be solved. The mere fact that the conceptual teaching of the Australian patent does not explain the precise details of how the Australian torque arm would fit into the '418 patent's configuration does not preclude a finding of obviousness.

The plaintiffs also argue that the forked support joint in the '418 patent teaches away from claim 1's solution. The court disagrees. Although the forked support joint teaches away from the solution claimed in claim 10, it does not as forcefully teach away from the solution claimed in claim 1. The purpose of the forked support joint, in part, is to effectively transfer torque from the gearbox to the drive line. The support joint allows the fourth U-joint always to have a zero operating angle as viewed from the top looking down. An artisan of ordinary skill would have understood that the forked support joint is what allows the drive line to steer the gearbox and absorb torque from the operating components. The court believes that an ordinary artisan looking to improve upon the problems associated with using the drive line to steer and absorb torque would have understood that the forked support joint would not have been necessary in a machine that did not use the drive line to steer or absorb torque.

### 4. Objective Considerations

### a. Independent Development

The defendant argues that Ken McLean independently developed the concept of steering structure as claimed in claims 1, 2, 8, and 9 of the '859 patent. The court agrees. Mr. McLean conceived of a pivot tongue rotary conditioner having a pivoting gearbox spaced horizontally from the tongue pivot axis and a telescoping steering linkage connected between the tongue and the gearbox. This is precisely the concept the '859 patent uses to solve the torque problem inherent in the '418 patent. Mr. McLean envisioned his idea as a way to allow the New Holland side pull machine to pivot from a field-tow position into a transport position without shutting off the drive line. Nonetheless, Mr. McLean's idea for steering the gearbox is conceptually identical to claim 1's idea.

The court believes Mr. McLean's work is highly probative evidence that claims 1, 2, 8, and 9 would have been obvious. Not only was Mr. McLean able to make the jump required to use a torque arm such as the arm on the Australian patent to steer and absorb torque in a multiply pivoting configuration, he also specifically identified, in early 1988, the very Australian patent this court has found to be so suggestive of obviousness.

### b. Copying; Praise in the Industry

The plaintiffs put on extensive evidence tending to show that defendant copied their machine. The court agrees that the defendant copied claims 1, 2, 8, and 9. The court does not, however, believe that this evidence weighs heavily in favor of nonobviousness. When the defendant learned of the plaintiffs' machines and began to realize how successful they were, the defendant began attempts to design a center pivot mechanical drive machine. The de-

fendant's first attempt at a center pivot machine was essentially a copy of the plaintiffs' machines. When the defendant became aware of the '859 patent, it went back to the drawing board and attempted to design a center pivot machine with a hydraulic drive system instead of a mechanical drive system. These attempts were wholly unsuccessful. The defendant finally arrived at the design reflected in the New Holland 1431 after scrapping the hydraulic drive idea. As the court has already concluded, *see Hay & Forage III*, 25 F.Supp.2d at 1199, these machines are literal copies of claims 1, 2, 8, and 9.

The court does not place much weight on the evidence of copying, however, because the copying could indicate the defendant's belief that claims 1, 2, 8, and 9 are invalid just as easily as it indicates the defendant thought highly of those claims:

> Since copying can be motivated by lack of concern for patent property, contempt for the specific patent in question, or an ability to enforce patent rights, "more than the mere fact of copying by an accused infringer is needed to make that action significant to determination of the obviousness issue."

Timothy R. DeWitt, *Use of Objective Evidence of Non–Obviousness in the Federal Courts,* 79 J. Pat. & Trademark Off. Soc'y 823, 834 (1997) (quoting *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1028 (Fed.Cir.1985)). The evidence at trial convinced the court that the defendant did not think particularly highly of the steering structure concept of claims 1, 2, 8, and 9. The defendant had an opportunity to pursue the idea when Mr. McLean came up with it, but elected not to. A memorandum in January, 1990 finally rejecting Mr. McLean's idea commented that "[d]ue to cost and complexity it is highly unlikely this idea will be pursued." The court concludes that the defendant thought highly of the steering structure idea when it learned that a simple placement of the steering structure at a point approximately equidistant from the opposite ends of the drive line would equalize U-joint angles (i.e. claim 10). The defendant had little

interest in the idea, however, when the only purpose of the steering structure was to orient the gearbox and relieve torque (i.e. claim 1).

### c. Commercial Success

Plaintiffs argue that the patent enjoyed commercial success. The court agrees. The evidence of commercial success on claims 1, 2, 8, and 9 is identical to the evidence of commercial success on claims 10 and 11.

The court believes the evidence of commercial success, however, is at best marginally probative of nonobviousness on claims 1, 2, 8, and 9. Nothing in the record indicates how claims 1, 2, 8, and 9 contributed to the commercial success independent of claims 10 and 11. The court believes that it was the solution to the U-joint angle problem identified in claim 10 that generated the commercial success. The court is not convinced that the solution to the steering and torque problem identified in claim 1 generated substantial commercial success. *See* Timothy R. DeWitt, *Use of Objective Evidence of Non–Obviousness in the Federal Courts,* 79 J. Pat. & Trademark Off. Soc'y 823, 828 (1997) ("Where the evidence shows that the popularity of a product is due to an unclaimed feature, the fact finder may not draw the inference that the success of the product is due to the merits of the claimed invention.") (citing *Sjolund v. Musland,* 847 F.2d 1573, 1582 (Fed.Cir.1988)). Again, the defendant had every opportunity to capitalize on whatever commercial value the key idea behind claim 1 had when Mr. McLean disclosed it in 1987. Instead, the defendant rejected the idea in 1990 because of cost and complexity considerations. The court infers from the defendant's conduct that the steering structure concept of claim 1 has little commercial value.

### d. Long-felt Need

The plaintiffs argue that the patent solved a long-felt but unsolved need. Again, however, the court concludes that it

was claims 10 and 11 that solved the long-felt need. Claims 1, 2, 8, and 9 did not.[26]

The prior art disclosed a number of center pivot, mechanical drive machines that would appear to have solved the general problem identified by the inventors of the '859 patent[27] just as well as claim 1 did. The Kuhn patent and its commercial embodiment, the Kuhn Alterna 500, for example, disclosed a center pivot disc mower conditioner with mechanical drive. The Niemeyer machine was similar. A machine manufactured by a European company named Vicon had characteristics similar to the Kuhn and Niemeyer machines. These machines, although they were not commercially successful solutions to the broad problem identified in the '859 patent, appear to the court to be just as successful as the solution proposed in claim 1.

The plaintiffs are quick to point out that Mr. Berlivet failed in his attempts to design a center pivot, mechanical drive mower conditioner, but the court does not believe this is evidence that claim 1 solved a long-felt but unsolved need. The Kuhn, Niemeyer, and Vicon machines achieved the very objective Mr. Berlivet sought: an economically producible center pivot, mechanical drive mower conditioner.

The plaintiffs also point to the defendant's failed attempts to design a machine with a hydraulic drive center pivot system, but the court concludes that these efforts are not evidence of a long-felt but unsolved need, either. There is nothing in the record that persuades the court that the defendant's attempts at a hydraulic drive system were anything other than a legitimate attempt to avoid what is claimed in the '859 patent. After witnessing first hand the costly, exhaustive litigation efforts by both parties in this case,[28] the court fully understands the defendant's motivation in attempting to avoid the patent completely before settling on a design more closely analogous to the '859 patent.[29]

### 5. Summary

In sum, the court concludes that claims 1, 2, 8, and 9 are invalid for obviousness. A person of ordinary skill in the art seeking to improve on the prior art of center pivot disc mower conditioners would have thought it obvious to combine the '418 patent with the torque arm concept of the Australian patent to produce claims 1, 2, 8, and 9. The prior art suggested this combination independent of any hindsight motivation from the '859 patent itself. Moreover, Ken McLean independently developed the steering structure concept approximately three and a half years before the application for the '859 patent was filed. Mr. McLean recognized near the time of his conception that the Australian patent had some bearing on his idea. Although there is evidence that the defendant copied claims 1, 2, 8, and 9 and evidence that the commercial embodiment of these claims enjoyed considerable commercial success, the court believes that these factors are entitled to only marginal weight on these facts.

### VIII. Conclusion

The court's judgment is for the defendant. The court concludes that the defendant's machine does not infringe claims 10 and 11 of the '859 patent. The court concludes that the '859 patent is not invalid for anticipation, derivation, or failure to name a coinventor. The court further concludes that claims 10 and 11 of the '859

---

26. Of course, the *lack* of a long-felt but unsolved need has no bearing on the obviousness inquiry. It would be improper to infer obviousness because of the absence of objective indicia of nonobviousness. *See Custom Accessories, Inc. v. Jeffrey–Allan Indus.,* 807 F.2d 955, 960 (Fed.Cir.1986).

27. See *supra,* note 23.

28. The court in no way means to imply that it regards the litigation efforts by either party to be excessive or wasteful. Much to the contrary, the court has high praise for the excellent representation provided by the lawyers on both sides of this lawsuit.

29. This reasoning also applies to the decision by John Deere & Co. to avoid the patent in suit in its center pivot design.

patent are not invalid for obviousness. Finally, the court concludes that claims 1, 2, 8, and 9 of the '859 patent are invalid for obviousness.[30]

**IT IS THEREFORE ORDERED BY THE COURT** that judgement be awarded in favor of the defendant.

**IT IS FURTHER ORDERED** that claims 1, 2, 8, and 9 of United States Patent No. 5,272,859 are invalid pursuant to 35 U.S.C. § 103.

**IT IS 80 ORDERED.**

30. During trial, the defendant moved to admit Exhibits D–684 and D–684A into evidence. The plaintiffs objected, and the court took the matter under advisement. The court now sustains the plaintiffs' objections as to both exhibits.

The proffered exhibit D–684 is not admitted. D–684 is a copy from the defendant's files of a pending patent application covering the steering mechanism on the defendant's Model 1431. Prior to trial, the plaintiffs objected to the admissibility of this document as hearsay, *see* Fed.R.Evid. 802, and the defendant has not come forward with an argument to meet this objection.

The proffered exhibit D–684A is also not admitted. D–684A is a copy of the United States Patent and Trademark Office's (PTO) file for the patent application which purports, among other things, to demonstrate the patent office's agreement with the defendant's position on obviousness in light of the Australian patent. The plaintiffs objected to this exhibit on authenticity grounds as well as on the basis of hearsay. The defendant believes the plaintiffs waived the authenticity objection pursuant to paragraph 5–I.H. of the pretrial order, which stipulates to the authenticity of uncertified copies of "United States and foreign patent applications, file wrappers, prosecution histories, and contents thereof[.]" The court does not believe that D–684A was contemplated by the stipulation because it does not fall within any of these categories. The court gave the defendant every opportunity to authenticate the exhibit through live testimony, but it did not. Moreover, there was no showing made that it satisfied the self-authentication provisions of Fed.R.Evid. 902. Because the document is not properly authenticated, the plaintiffs' objection is sustained.